### STATE OF CONNECTICUT *v.* JAMES ESPOSITO
### (14012)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued April 30—decision released August 4, 1992

*Richard Emanuel,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom were *James G. Clark,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

CALLAHAN, J. After a jury trial, the defendant, James Esposito, was convicted of the crimes of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and burglary in the first degree in violation of General Statutes § 53a-101 (a) (1).[1] He was

---

[1] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

General Statutes § 53a-134 (a) (2) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . is armed with a deadly weapon."

General Statutes § 53a-101 (a) (1) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a build-

sentenced to an effective term of thirty years imprisonment. The defendant appeals from that judgment of conviction, claiming entitlement to a new trial because the trial court: (1) improperly denied his motions during jury selection to excuse certain venirepersons for cause; (2) improperly allowed the state to exercise some of its peremptory challenges in a racially discriminatory manner; and (3) improperly admitted certain evidence and excluded other evidence. We agree with the first of these claims and grant the requested relief. It is therefore unnecessary for us to consider the second claim. We discuss the third claim involving certain evidentiary rulings insofar as the same evidentiary issues are likely to arise at retrial. *State* v. *Rinaldi,* 220 Conn. 345, 359–60, 599 A.2d 1 (1991).

At trial the state presented evidence tending to establish the following. On September 5, 1988, at approximately 11:30 p.m., the defendant and another man, Brian Greco, entered the Hamden home of Robert and Joyce Bessinger, where the Bessingers, their young daughter and a guest, Robert Velardi, were present. While Greco accompanied Robert Bessinger, at gunpoint, upstairs to the room where the daughter was sleeping and where there were two safes containing valuables, downstairs the defendant stood guard over Joyce Bessinger and Velardi, whom Greco had ordered to lie face down on the floor. The defendant told them to remain still or he would "blow [their] head[s] off." Meanwhile, Greco removed some items from the safes and then, in the course of a struggle, shot Robert Bessinger three times, inflicting wounds that proved fatal. The defendant and Greco then fled the scene together.[2]

---

ing with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument."

[2] Prior to the defendant's trial, Greco pleaded guilty to the crimes of felony murder, robbery in the first degree and burglary in the first degree pursuant to the doctrine of *North Carolina* v. *Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), and received a total effective sentence of fifty

The defendant offered contrary testimony at trial. He admitted being with Greco on the night in question, but stated that he had entered the Bessinger home after Greco and that he had done so not to aid Greco in the commission of the crimes but rather to try to rescue Robert Bessinger, a friend of his family, once he had realized what Greco was doing. The defendant testified that he had initially denied being at the crime scene when questioned by the police because Greco had threatened to kill him and to "get" his family if he told anyone about the crimes.

I

The defendant first claims that, during jury selection, the trial court improperly denied his motions to excuse four venirepersons for cause. This claim is properly before us because the defendant exhausted his peremptory challenges before jury selection had been completed. See State v. Vitale, 190 Conn. 219, 224–25, 460 A.2d 961 (1983); State v. Hoyt, 47 Conn. 518, 529 (1880).

Some background information is necessary for the proper analysis of this claim. On the first day of jury selection, the defendant challenged for cause a prospective juror named Norman Wium. The court overruled the challenge, and the defendant removed Wium by exercising his second peremptory challenge. On the fourth day of the voir dire, the defendant challenged another juror, Lisa Zarny, for cause. When that challenge for cause was overruled he exercised his eleventh peremptory challenge to remove her. Four days later, after the twelfth juror had been accepted and as the alternates were being selected, the defendant challenged another venireperson, William Demmons, for cause. When the court overruled that challenge, the defendant exercised his final peremptory challenge to

years imprisonment. Thereafter, he attempted, unsuccessfully, to withdraw his guilty plea. See State v. Greco, 216 Conn. 282, 579 A.2d 84 (1990).

excuse Demmons.[3] After the first alternate juror had been accepted, the defendant challenged another prospective juror, Richard Artkop, for cause. The trial court overruled the challenge for cause and denied the defendant's subsequent motion for an extra peremptory challenge. Consequently, Artkop become the second alternate juror. Jury selection was completed when a third alternate juror was chosen.

Before the trial began, the trial court excused one of the twelve jurors and proposed replacing that juror with the first alternate juror. Defense counsel objected to that method, stating, "I want it done in the way an alternate juror is always chosen, and that is throw [their names] in a hat, pick one out." When the prosecutor stated that he had no objection to that procedure, the court directed the clerk to select one alternate randomly. Artkop, the second alternate, was selected and then became a member of the jury that convicted the defendant.

The defendant argues that, although only one of the four persons challenged for cause actually sat on the jury that convicted him, he is entitled to a new trial if any one of the four should have been excused for cause because under such circumstances, the defendant would have had a peremptory challenge remaining to excuse Artkop, who was a juror in the case. The state does not dispute that general proposition,[4] but argues that, in this case, the defendant waived this claim with respect to all four individuals because he could have avoided having Artkop empaneled on the jury if he had acquiesced in the trial court's original

[3] The state and the defendant each had eighteen peremptory challenges in this case. See General Statutes § 54-82h (a).

[4] The state conceded at oral argument that, once a defendant exhausts his peremptory challenges, he is entitled to raise a claim on appeal with respect to venirepersons whom he had sought to remove for cause *before* as well as after he exhausted the peremptory challenges.

plan to empanel the first alternate juror, whom both parties had accepted without controversy. The state contends that, by insisting that the replacement juror be selected randomly, resulting in the selection of Artkop for the jury, the defendant "manufactured" this claim and induced the very prejudice of which he now complains on appeal. See *State* v. *Scognamiglio,* 202 Conn. 18, 25, 519 A.2d 607 (1987) ("Action induced by [the defendant] cannot ordinarily be a ground of error."). We do not agree that the defendant's conduct constitutes a waiver of this claim.

General Statutes § 54-82h (c) provides in part: "If, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him and, if any juror is so excused or dies, the court may order that an alternate juror *who is designated by lot to be drawn by the clerk* shall become a part of the regular panel and the trial shall then proceed as though such juror had been a member of the regular panel from the time when it was begun." (Emphasis added.) Although defense counsel did not specifically cite § 54-82h (c) when he requested that the replacement juror be selected by lot, the statute suggests, at least by analogy, that such a procedure be followed if the court has decided to empanel an alternate juror after the completion of jury selection.[5] Consequently,

[5] At oral argument, the state initially contended that, because General Statutes § 54-82h (c) contains the word "may," it is directory rather than mandatory and that the trial court was, therefore, not required to follow the random selection procedure. It later retreated from that position, conceding that, if a party were to insist on the procedure set forth in the statute, as the defendant did in this case, the court would be bound to follow that procedure.

Although the state did not pursue the argument further, we note that in the statute "may" is used in conjunction with the trial court's decision whether to empanel an alternate juror in the first place and not in conjunction with the method to be used in selecting the replacement juror once the court has decided to do so: "[T]he court *may* order that an alternate juror who *is* designated by lot to be drawn by the clerk shall become a part of the regular panel . . . ." (Emphasis added.) General Statutes § 54-82h (c).

we agree with the defendant that under such circumstances he should not be faulted for insisting on a procedure that is arguably statutorily required. Indeed, had the trial court not followed the prescribed statutory procedure, the defendant might well have advanced an appellate claim on that basis.[6] See *State* v. *Pina,* 185 Conn. 473, 482, 440 A.2d 962 (1981) ("a trial court's failure to follow the mandatory provisions of a statute prescribing trial procedures is plain error"). Accordingly, we turn to the merits of the defendant's argument.

We focus first on the defendant's challenge to remove Lisa Zarny for cause because we find the claim with respect to Zarny to be dispositive. When first brought in for voir dire questioning, Zarny responded negatively when asked by the court whether she had thought of anything "bearing on [her] ability to be a fair juror in this case." In the course of defense counsel's questioning of her, Zarny stated that she lived on the same street where the Bessinger home is located and that she had lived there for approximately one and one-half years. She explained that the street is long and "L" shaped and that, because her home is toward one end of the "L," she knew the neighbors on that part of the street. When asked whether the names of any prospective witnesses were familiar to her, she replied affirmatively. The court then interjected to ask Zarny whether her proximity to the crime scene or any discussions she had had about the crime would compromise her ability to be a fair juror in the case. She said no.

Defense questioning then resumed. Zarny recalled reading several newspaper accounts about the incident at the Bessinger home and about the defendant's arrest in connection with it. She stated that, since she had

---

[6] The state has not argued that the statute is invalid because it unconstitutionally infringes on the court's power to establish its own procedural rules. See *State* v. *Clemente,* 166 Conn. 501, 507, 353 A.2d 723 (1974); *Adams* v. *Rubinow,* 157 Conn. 150, 156, 251 A.2d 49 (1968).

moved to the neighborhood only a short time before the crimes were committed, "it was a shock" to her when she heard about the incident for the first time. Defense counsel then said, "And what is obviously going through my mind is you live on the street where the murder took place, and it sounds on the face of it that *you would have a peculiar interest in this case* because of that. *Is that a fair statement?"* (Emphasis added.) Zarny replied, *"That's a fair statement."* (Emphasis added.) Upon further questioning, Zarny stated that she had discussed the case with her husband and that together they had formed an opinion that the murder was drug-related. When asked whether she had formed any opinion about the defendant's involvement in the murder she responded that she had not. In response to defense counsel's inquiry about why Zarny had not mentioned her proximity to the crime scene and familiarity with the case when asked by the court whether anything might bear on her ability to sit as a juror, Zarny responded that she had assumed that her address would be noticed on the juror questionnaire form she had previously filled out.

Thereafter, the following colloquy occurred:

"[Defense Counsel:] *Do you think it would put you in an awkward position going back to . . . [your street] if you found [the defendant] not guilty and therefore left the crime unsolved to that extent?*

"[Lisa Zarny:] *Yes.*

"Q. *It would put you in an awkward position?*

"A. *Yes. . . .*

"Q. Since you think [that acquitting the defendant would put you in an awkward position], *don't you think you couldn't be totally objective in sitting on this case . . .* in viewing his guilt or innocence?

"A. In terms of finding someone guilty or not guilty, would depend on the evidence, *yes I feel uncomfortable with [the defendant] or the crime he committed in my neighborhood, yes.*" (Emphasis added.) After this exchange and at several other junctures during the voir dire questioning, Zarny assured defense counsel that she could, nevertheless, be completely fair and objective as a juror in the case.

After the state had finished its questioning of Zarny, defense counsel moved that she be removed for cause. In support of his motion, he reminded the court that Zarny lived on the same street where the murder had taken place, that several of her neighbors would be testifying as witnesses in the case, that she was shocked by the crime, that she felt it would put her in an awkward position if she were to acquit the defendant and that Zarny was not forthcoming about any of these facts when asked at the beginning of questioning whether she could think of anything that might compromise her ability to be a fair juror in the case. The state took no position on the challenge for cause. Relying on Zarny's assurances that she could still be impartial, the trial court denied the motion for her removal. Defense counsel excepted and excused her with a peremptory challenge.

We begin our analysis by setting forth the sources in our law of the defendant's right to an impartial jury and his correlative right to have a biased venireperson removed for cause. Both the federal and state constitutions guarantee to an accused the right to a public trial by an impartial jury. U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8. Furthermore, General Statutes § 54-82f provides in relevant part: "If the judge before whom the [voir dire] examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any fur-

ther service upon the panel, or in the action, as the judge determines. . . ." Practice Book § 848 contains language virtually identical to that of the statute, and Practice Book § 843 similarly provides that "[a] person shall be disqualified to serve as a juror if such person is found by the judicial authority to exhibit any quality which will impair his capacity to serve as a juror . . . ."

Although the defendant bases his claim on statutory and Practice Book provisions, reference to common law principles regarding challenges for cause is instructive. At common law, "a challenge [for cause] to an individual juror for bias or prejudice can be either a principal challenge or a challenge to the favor. *McCarten* v. *Connecticut Co.,* [103 Conn. 537, 542, 131 A. 505 (1925)]. A principal challenge may arise when the connection between the prospective juror and either party is of so close a nature that, when the facts concerning the relationship or interest are proven or when the prospective juror 'has formed or expressed an opinion on the question at issue,' the disqualification is conclusively presumed. Id.; see, e.g., *State* v. *Kokoszka,* 123 Conn. 161, 164, 193 A. 210 (1937). A challenge to the favor, on the other hand, is one where the connection, being more remote, tends to show bias but does not create a conclusive presumption of bias. *McCarten* v. *Connecticut Co.,* supra, 542–43." *Johnson* v. *New Britain General Hospital,* 203 Conn. 570, 581–82, 525 A.2d 1319 (1987).

In this case, the defendant's claim with respect to Zarny is akin to a recognized ground for a principal challenge at common law, namely, "an interest in the outcome of the suit, either personal or as a member of a corporation." *McCarten* v. *Connecticut Co.,* supra, 542.[7] We must, therefore, examine the record of the

[7] Grounds for a principal challenge include "relationship to either party to the suit, a former service as arbitrator on either side, an interest in the

voir dire proceedings to determine whether it discloses such a personal interest on the part of Zarny and thereby raises a conclusive presumption of bias. In reviewing this claim, we recognize that "[t]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion." *State* v. *Cubano,* 203 Conn. 81, 88–89, 523 A.2d 495 (1987). "In exercising this discretion the trial court must zealously protect the rights of the accused." Id., 89. We conclude that the trial court abused its discretion in this case when it overruled defense counsel's challenge to remove Zarny for cause.

Zarny admitted that acquitting the defendant would put her in an awkward position because she would have to return to her neighborhood with the crimes still unresolved. This admission, made *twice* by Zarny, reveals that she had a personal stake in the outcome of the case and that she was, quite possibly, disinclined to find the defendant not guilty because of the discomfort such a result might have created for her in her neighborhood, where the crimes were committed. Indeed, Zarny agreed with defense counsel that she had a "peculiar interest" in the case and further admitted that she was "uncomfortable" with the defendant "or [with] the crime he committed in my neighborhood."

In overruling the challenge for cause, the trial court relied on Zarny's assurances that she could be even-handed in spite of her other admissions indicating a personal interest. Although we have stated that "[t]he determination as to a potential juror's impartiality, in

outcome of the suit, either personal or as a member of a corporation, or the relation of master or servant, steward, attorney, landlord or tenant to either party, or that the prospective juror has conversed with either party upon the merits of the case, or has formed or expressed an opinion on the question at issue." *McCarten* v. *Connecticut Co.,* 103 Conn. 537, 542, 131 A. 505 (1925).

which demeanor plays an important part, is particularly within the province of the trial judge"; *Johnson* v. *New Britain General Hospital,* supra, 584; there are limits to the deference we will afford such a judgment on appeal. See *State* v. *Hammond,* 221 Conn. 264, 270 n.2, 604 A.2d 793 (1992). As we noted recently in a related context, "[a] venireperson's assessment of his own prejudices may be untrustworthy for a variety of reasons. For instance, he may be lying in an effort to be chosen for the jury, embarrassed to reveal unsavory truths publicly or simply unaware of the existence of bias." *State* v. *Smith,* 222 Conn. 1, 14–15, 608 A.2d 63 (1992). Because of these practical realities, a prospective juror's assessment of his or her own partiality must be carefully scrutinized on appeal and considered in the context in which it was uttered.

There are circumstances in which a trial court can reasonably credit assurances of fairness by a prospective juror and therefore properly conclude that the venireperson will be able to set aside any potential bias or prejudice to adjudge dispassionately the accused's guilt or innocence. For example, in *Johnson* v. *New Britain General Hospital,* supra, this court upheld the trial court's overruling of a challenge for cause in a medical malpractice action. The challenged juror was a dentist who had expressed general antagonism toward medical malpractice suits and large jury verdicts. In affirming the judgment, we emphasized that "the juror did make clear that this antagonism was a generalized opinion held in the abstract and that it would not enter into his consideration of this specific case" and that he "never indicated any antagonism toward this particular plaintiff." Id., 584. Zarny, in contrast, indicated not only a personal interest in the outcome of the prosecution but also a discomfort with the defendant himself or, as she put it, with "the crime he committed in my neighborhood." These statements dis-

tinguish the instant case from *Johnson* because they demonstrate that Zarny's bias was particularized toward the defendant and not simply a general pre-existing view.

The Alabama Court of Criminal Appeals upheld a decision overruling the defendant's challenge for cause to a juror who worked at the same power company that employed the victim. *Glenn* v. *State,* 395 So. 2d 102 (Ala. Crim. App. 1980), cert. denied, 395 So. 2d 110 (Ala. 1981). The court specifically relied on the fact that, "[u]pon questioning by the trial court as to whether his employment with the [company] would cause him embarrassment, or place him in an *awkward position* . . . the juror replied in the negative." (Emphasis added.) Id., 106–107. Conversely, the Supreme Court of Louisiana upheld the removal of a venireperson who had indicated during voir dire that he frequented the bar where the crime was committed, that he knew many of the people who would be testifying at trial and that *he feared repercussions if he were to return a verdict of guilty. State* v. *George,* 346 So. 2d 694, 698 (La. 1977). These factually similar cases from other jurisdictions provide further support for our conclusion that in this instance the challenge for cause should have been granted.

Having concluded that Zarny should have been removed by the trial court for cause, we must now consider the impact the court's ruling had on the defendant at trial. As we noted previously, Zarny did not ultimately sit as a juror in the case because the defendant exercised a peremptory challenge to remove her. Artkop, however, did sit on the jury because the defendant, who had by then exhausted his peremptory challenges, was unable to remove him. That the defendant would have removed Artkop can hardly be doubted since he challenged him for cause and moved the court for an extra peremptory challenge in an attempt to do

so.[8] If Zarny had been properly removed by the court for cause, the defendant would have had one peremptory challenge remaining to remove Artkop from the jury.

The Connecticut constitution guarantees a criminal defendant the right to exercise peremptory challenges in the selection of his jury. Conn. Const., art. I, § 19, as amended by art. IV of the amendments to the constitution; see also General Statutes §§ 54-82g and 54-82h. We conclude that the trial court's action abridged this constitutional and statutory right of the defendant. Accordingly, we agree with numerous other courts throughout the nation that "it is reversible error for a trial court to force an accused to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied." *Hill* v. *State,* 477 So. 2d 553, 556 (Fla. 1985); see also *Wasko* v. *Frankel,* 116 Ariz. 288, 290, 569 P.2d 230 (1977); *Jones* v. *Cloud,* 119 Ga. App. 697, 706–708, 168 S.E.2d 598 (1969); *State* v. *Sugar,* 408 So. 2d 1329, 1331 (La. 1982); *State* v. *Ternes,* 259 N.W.2d 296, 297 (N.D. 1977), cert. denied, 435 U.S. 944, 98 S. Ct. 1524, 55 L. Ed. 2d 540 (1978); *Commonwealth* v. *Jones,* 477 Pa. 164, 167, 383 A.2d 874 (1978); *State* v. *McQuesten,* 151 Vt. 267, 269, 559 A.2d 685 (1989); *Martin* v. *Commonwealth,* 221 Va. 436, 444–45, 271 S.E.2d 123 (1980). The defendant is, therefore, entitled to a new trial.

## II

The first evidentiary issue likely to arise at retrial involves the admissibility of an out-of-court statement

---

[8] Artkop had an extensive law enforcement background, had testified in the same courthouse where this case was tried for the same state's attorneys' office that prosecuted this case and had served as court liaison officer for geographical area number seven, which included the Hamden police department.

of Greco introduced through the testimony of a Hamden police officer. At trial, the court permitted the state to elicit from the officer Greco's initial statement to the police regarding his whereabouts on the night the crimes were committed. According to the officer's testimony, Greco told the police essentially what the defendant had told the police when he was initially questioned about his whereabouts, that he was with the defendant at a bar for most of the evening, that the two had left and driven to Newport, Rhode Island, and that they had later spent the night in a hotel together.[9] Both statements omitted any reference to either man having been in Hamden at the Bessinger home that night. The state offered the evidence, claiming that the fact that the men had given substantially similar false exculpatory statements when questioned by the police tended to prove the defendant's participation in the crimes. After the admission of Greco's out-of-court statement, over the defendant's objection, the trial court instructed the jury that the statement was not offered for its substantive truth but rather to show the men's joint involvement in the crimes.

The defendant first claims that Greco's out-of-court statement should have been excluded as hearsay because it was, in actuality, offered for its substantive truth since it inferentially asserted the proposition that Greco and the defendant committed the crimes and hence needed to concoct an alibi to conceal their

[9] There were some differences between Greco's statement and the defendant's statement. For example, Greco said the two had been in an unnamed bar in Milford and that they had left the bar at 10:30 or 11 p.m. The defendant stated that he had been at the Orange Blossom Cafe in Orange and had left at 1 a.m. Greco also stated that he and the defendant had spent the night in a hotel in Niantic, but the defendant said the hotel where they had stayed was in Newport. Although the defendant argued at trial that Greco's statement should be excluded because it was not sufficiently similar to the defendant's initial statement, he has not pressed that claim on appeal.

involvement. See *Lyle* v. *Koehler,* 720 F.2d 426, 429–33 (6th Cir. 1983) (adopting broad view of what constitutes hearsay as discussed by E. Morgan in "Hearsay Dangers and the Application of the Hearsay Concept," 62 Harv. L. Rev. 177 [1948]). In Connecticut, an out-of-court statement offered to prove the truth of the matter asserted is hearsay. *Murray* v. *Supreme Lodge, N.E.O.P.,* 74 Conn. 715, 718, 52 A. 722 (1902). If such a statement is offered for a purpose other than establishing the truth of the matters contained in the statement, it is not hearsay. *State* v. *Miller,* 154 Conn. 622, 629, 228 A.2d 136 (1967).

In this case, the statement was offered to show that Greco gave a false alibi that was substantially similar to that given by the defendant. It was not offered to prove that Greco and the defendant actually were at a bar together or that they went to Newport or that they later spent the night in a hotel. We decline to adopt the broad view of hearsay taken by the majority in *Lyle* v. *Koehler,* supra, and agree, rather, with the dissenter in that case that "the 'matter asserted' [is] the matter asserted by the writing or speech, not the matter asserted by the proponent of the evidence." Id., 436–37 (Porter, J., dissenting). Accordingly, if, on retrial, the state offers Greco's out-of-court statement to prove that it was made and not for the truth of the matters asserted therein, it should not be excluded as hearsay.

To be admissible, Greco's out-of-court statement must also be relevant, both in the sense that it must relate to a material issue in the case and that it must have a logical tendency to aid the trier in the determination of a material issue. *State* v. *Marra,* 222 Conn. 506, 521, 610 A.2d 1113 (1992); *State* v. *Jeffrey,* 220 Conn. 698, 704, 709, 601 A.2d 993 (1991). We believe that it meets both components of the test for relevancy. First, it was offered to prove that the defendant actively participated in the crimes contrary to his testimony that he

had been a mere onlooker. The level of the defendant's involvement was clearly a material issue in the case. As to the second component, logical relevancy, from the fact that Greco told the police the same false exculpatory story as the defendant, the jury could reasonably infer that the two had concocted a false alibi and agreed to adhere to it if questioned by the police. Although the jury could also reasonably infer that the men's similar alibis were nothing more than a coincidence, that possibility does not make Greco's statement irrelevant.[10] "Evidence need not be conclusive to be relevant . . . and [t]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Joly*, 219 Conn. 234, 252, 593 A.2d 96 (1991). If offered on retrial for the same purpose for which it was offered during the first trial, evidence of Greco's statement would be relevant as tending to support, at least to some degree, the conclusion that the defendant colluded with Greco to commit the crimes. *State* v. *Rinaldi*, 220 Conn. 345, 353, 599 A.2d 1 (1991).

The final basis upon which the defendant argues that Greco's statement should be excluded is that its admission would deprive him of his right of confrontation under the federal and state constitutions. See U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8. If the state again introduces Greco's statement for the nonhearsay purpose of simply proving that it was made, the defendant's right of confrontation will not be implicated. Under such circumstances, since the jury would

---

[10] The jury could also reasonably infer that the defendant had given the false alibi out of fear that Greco would kill him, an inference supportive of the defendant's version of the facts.

not be asked to credit Greco's statement for its truth, Greco's credibility would not be in issue, and, therefore, the defendant would have no right to cross-examine him on the contents of his statement. *Anderson* v. *United States,* 417 U.S. 211, 220, 94 S. Ct. 2253, 41 L. Ed. 2d 20 (1974). If the defendant should wish to dispute that Greco made the statement, he should be afforded ample opportunity to cross-examine the testifying police officer regarding the officer's credibility in asserting that Greco had made such a statement. Admission of Greco's out-of-court statement would not, therefore, implicate the defendant's constitutional right to confront the witnesses against him.[11]

## III

The defendant next claims that, under the rule announced in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the state should be precluded from introducing testimony referring to his silence before he was arrested or given *Miranda* warnings. At trial, a police inspector testified that, on September 16, 1988, ten days after the commission of the crimes, the defendant had voluntarily spoken with members of the Hamden police after he had been advised that he was not under arrest, that he was free to leave the police station at any time and that he did not have to answer any questions put to him. He was not then advised of his *Miranda* rights. The inspector testified that the defendant indicated that he had been with Greco on the night in question and that he had done various things with Greco that night, but the state-

---

[11] The defendant concedes that, because Greco's statement, on its face, did not inculpate the defendant, the holding of *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), does not apply. In *Bruton,* the United States Supreme Court held that the defendant's rights under the confrontation clause of the sixth amendment to the United States constitution were violated when the trial court admitted into evidence at a joint trial the confession of a nontestifying codefendant, which also incriminated the defendant.

ment omitted any reference to their having gone to the Bessinger home in Hamden. The defendant then refused to allow the police to take a formal statement from him as to what he had just said, but told the police that he would return to provide such a statement. He never returned to the police station to give a statement before he was arrested on September 20, 1988.

The defendant later took the stand and testified that he and Greco had been at the Bessinger home on September 6, 1988, that he had not participated with Greco in committing the crimes and that Greco had forced him to leave the scene with him and to stay overnight in the hotel. He also explained that he had not mentioned going to the Bessinger home when he first spoke with the police because Greco had threatened to kill him if he told the authorities about the incident. During cross-examination of the defendant, the state asked, referring to the defendant's assertion that Greco had held him in the hotel against his will, "And did you ever give a thought to the fact that it might be useful to be able to recount this at some point to the police?" The state also referred to the defendant's failure to mention his presence at the Bessinger home when he gave his first informal statement to the police.

In *Doyle* v. *Ohio,* supra, the United States Supreme Court held that the due process clause of the federal constitution prohibits the government's use of a defendant's postarrest silence to impeach his credibility because, once an accused is given *Miranda* warnings, which include the right to remain silent, he may not be penalized for exercising that right. In *State* v. *Plourde,* 208 Conn. 455, 466–67, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989), this court extended the *Doyle* prohibition to the use of a defendant's silence after he had received *Miranda* warnings but before he was actually arrested. In reaching that conclusion, we relied upon

language from a United States Supreme Court case decided after *Doyle*, in which the court explained: "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." *Wainwright* v. *Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). Because it is the *Miranda* warning itself that carries with it the promise of protection, the United States Supreme Court has concluded that the prosecution's use of silence prior to the receipt of *Miranda* warnings does not violate due process. *Fletcher* v. *Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (postarrest silence); *Jenkins* v. *Anderson*, 447 U.S. 231, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (prearrest silence).

According to this precedent, if, on retrial, the prosecution should make mention of the defendant's initial failure to tell the police that he was at the Bessinger home on the night the crimes were committed or of his subsequent failure to return to the police station to give a recorded statement *before he was advised of his Miranda rights,* the defendant's right to due process of law would not be abridged. The state may not, however, impeach the defendant's credibility by using his silence following his receipt of *Miranda* warnings. Since the state's other cross-examination question— why the defendant did not tell the police *"at some point"* that he had gone with Greco against his will— was not uttered in the context of questions addressed to the defendant's silence before he was arrested, it could reasonably have been understood to encompass the defendant's silence both before and *after* his arrest. Compare *State* v. *Jeffrey,* supra, 721 (context indicated that state's ambiguous question referred to the defendant's prearrest silence). Accordingly, such a question

should not be allowed on retrial unless its context clearly indicates that it refers only to the defendant's *prearrest* silence.

## IV

The next evidentiary issue likely to arise at retrial is whether the defendant should be allowed to present evidence of Greco's conviction and fifty year sentence. At trial, the defendant offered the evidence on two different theories of admissibility: first, that it should be admitted to prove that someone else had already been convicted of murdering Robert Bessinger; and second, that it should be admitted as tending to support the defendant's claim that, although he lied to the police initially because he was afraid Greco would kill him, he was testifying truthfully at trial because he no longer had to fear Greco's threats since Greco was incarcerated and serving a fifty year sentence. The trial court rejected both grounds of admissibility. We conclude that, at the new trial, the evidence should not be admitted for the first purpose for which it was offered, but that it would be admissible under the second theory if the defendant's other testimony advances the theory that Greco's long incarceration enboldened him to testify truthfully.

If offered for the first purpose argued by defense counsel at trial, the conviction and sentence would clearly be inadmissible as irrelevant. As we noted previously in conjunction with another evidentiary issue, evidence is relevant if it has a logical tendency to aid the trier in the determination of a material issue. *State* v. *Marra,* supra; *State* v. *Jeffrey,* supra, 704, 709. The fact that Greco was convicted and sentenced in connection with the crimes committed at the Bessinger home does not tend to establish anything about whether the

defendant was guilty of the crimes with which he was charged, relative to the same incident. That another man may have been punished for the crimes sheds no light on whether the defendant participated in the commission of the crimes. Consequently, Greco's conviction and fifty year sentence should be excluded as irrelevant if offered at the new trial to show that another person had been convicted in connection with the incident at the Bessinger home.

If, however, the defendant should offer evidence that he knew of Greco's conviction and fifty year sentence and that he was now, therefore, able to testify truthfully about the crimes since he believed that Greco, while in prison, would not be able to carry out death threats against him, such evidence would be admissible. It would tend to establish a material issue in the case, namely, that the defendant's trial testimony is truthful despite his earlier inconsistent statement to the police. We emphasize that, although such evidence might not be credited by the jury or, if credited, might not conclusively establish the defendant's veracity, it would, nevertheless, be admissible as relevant evidence since it tends to establish, even if only to a slight degree, a material proposition in the case. *State* v. *Rinaldi*, supra.

## V

The final evidentiary issue likely to arise at retrial involves the admissibility of a letter written by an assistant state's attorney and sent to defense counsel. The letter advised defense counsel that the state's attorneys' office for the judicial district of New Haven had learned that Greco had approached another inmate in jail to request that he arrange to have the defendant "hit" so that he would not divulge any informa-

tion about the crimes at the Bessinger home.[12] Upon receiving the letter, defense counsel forwarded a copy of it to the defendant. The defendant offered the letter at trial for two purposes: first, as relevant to the defendant's state of mind in that his knowledge of the contents of the letter contributed to the fear that he harbored for Greco; and, second, as independent evidence that Greco was attempting to have the defendant killed. The trial court excluded the evidence as irrelevant.

The letter would be admissible if the defendant were to offer it upon retrial for the first purpose, that is, the limited purpose of proving that his knowledge of the contents of the letter contributed to his fear of Greco and kept him from coming forth with the truth about the crimes. If the defendant again acknowledges the inconsistency between his initial statement to the police and his trial testimony and attempts to explain that he failed to tell the truth because he was afraid of Greco's threats, the letter should be admitted as tending to

---

[12] The text of the letter follows:

"May 8, 1989

Hugh F. Keefe, Esquire
P.O. Box 1612
New Haven, CT 06506
RE: State v. James Esposito
Dear Hugh,

Please be advised that this office was informed of a jailhouse incident in which Brian Greco approached an inmate at the jail and requested that that inmate arrange to have James Esposito 'hit,' expressing concern that Mr. Esposito might divulge information pertaining to criminal involvement of the two, i.e., Esposito and Greco, additional [sic] to the Bessinger homicide.

The inmate informed the police so that, needless to say, he has no intention of carrying out the request, but I feel that this is information you should be aware of.

Very truly yours,
/s/ Roland D. Fasano
Assistant State's Attorney"

establish that the defendant did not come forth with the truth because he was afraid that Greco would kill him. *State* v. *Rinaldi,* supra. If offered for this purpose, the letter should be admitted into evidence, and the jury should be instructed as to its proper use. *State* v. *Tryon,* 145 Conn. 304, 309, 142 A.2d 54 (1958).

If offered at retrial for the second purpose, to prove that Greco had put a "hit" out on the defendant, the letter should be excluded as hearsay since it would be offered to prove the truth of its contents. As we noted previously, an out-of-court statement offered to prove the truth of the matter asserted is properly excluded as hearsay. *Murray* v. *Supreme Lodge, N.E.O.P.,* supra. Although there are numerous exceptions to the hearsay rule, the defendant did not argue either at trial or on appeal that an exception to the hearsay rule would justify admission of the letter for its substantive truth. Accordingly, we shall not embark on an exegesis of whether the letter might be admissible on retrial under an exception to the hearsay rule.

The judgment is reversed, and the case is remanded for a new trial consistent with this opinion.

In this opinion the other justices concurred.