## STATE OF CONNECTICUT *v.* BEN B. OMAR
### (AC 32705)

DiPentima, C. J., and Beach and Borden, Js.

---

Argued March 13—officially released June 5, 2012

*Daniel J. Krisch*, special public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's

attorney, and *Jason Germain,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Ben B. Omar, appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), conspiracy to sell narcotics by a person who is not drug-dependent in violation of General Statutes §§ 21a-278 (b) and 53a-48 (a), sale of a controlled substance within 1500 feet of a school zone in violation of General Statutes § 21a-278a (b) and possession of a controlled substance within 1500 feet of a school zone in violation of General Statutes § 21a-278a (b). On appeal, the defendant claims that: (1) the trial court improperly denied his for cause challenges to three venirepersons; and (2) he was denied his constitutional right to a fair trial due to prosecutorial impropriety. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 25, 2009, Waterbury police Lieutenant Edward Apicella led an undercover team to the intersection of North Main Street and West/East Farm Streets in Waterbury, a location known as the "Sugar Bowl," in order to try "to purchase narcotics from any individual who would solicit." Apicella designated Officer Dedrick Wilcox of the Seymour police department to be the undercover purchaser because it was likely that he would not be recognized by the Waterbury street dealers as a police officer. As Wilcox was driving, a black female, later identified as Ida Mae Smith, nodded to him, and Wilcox pulled over. Smith asked, "[W]hat do you need?" and Wilcox responded, "I need twenty of base," which meant $20 worth of crack cocaine.

Smith then held up two fingers and yelled across the street to the defendant, "I need two." Wilcox then handed Smith the money, at which point the defendant walked to a nearby mailbox, reached into his pocket and placed two items on the top of the mailbox. Smith walked across the street and handed the money to the defendant, who pointed Smith toward the mailbox. Smith then walked to the mailbox, grabbed the items and handed Wilcox the items—two bags of crack cocaine—and said, "[Y]ou're all set." Wilcox then left the scene and radioed to the surveillance team that the deal was done and met the officers at a prearranged location. The police did not immediately arrest the defendant because they did not want to jeopardize Wilcox's safety or cover for future ongoing undercover operations. Instead, the defendant was arrested six weeks later in May, 2009. Additional facts will be set forth as necessary.

I

The defendant first claims that he was forced to exercise his peremptory challenges to strike certain potential jurors during voir dire because the court improperly denied three for cause challenges. He claims specifically that, as a result of using his peremptory challenges to strike potential jurors who should have been stricken for cause, he was left with an insufficient number of peremptory challenges with which to strike venirepersons K.S. and E.C.[1] In response, the state argues that the defendant's claim is not reviewable because the defendant did not seek an additional peremptory challenge. We agree with the state that, because the defendant did not seek an additional peremptory challenge, the claim is not reviewable.

The following additional facts are relevant to the resolution of this issue. During voir dire, the defendant

[1] See State v. Kelly, 256 Conn. 23, 30 n.4, 770 A.2d 908 (2001) ("[w]e use the initials of . . . venirepersons to protect their privacy").

moved to excuse three venirepersons for cause. The court denied each motion, and the defendant then exercised peremptory challenges on the first two challenged venirepersons, S.H. and B.M. The defendant exhausted his peremptory challenges when he excused B.M. The third challenged juror, K.S., was accepted as an alternate, and later was made a regular juror because, as the defendant acknowledged, he did not "have any peremptory challenges left" and therefore was unable to excuse K.S. The defendant neither sought, nor was denied, an additional peremptory challenge for that juror. A final alternate, E.C., was also accepted after the defendant acknowledged that a for cause challenge would be baseless. Although claiming that he would have used a peremptory challenge on this juror had he not already used all such challenges, the defendant neither sought, nor was denied, an additional peremptory challenge for that seated alternate.

"[I]t is reversible error for a trial court to force an accused to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges *and an additional challenge is sought and denied.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Esposito*, 223 Conn. 299, 313, 613 A.2d 242 (1992). Since *Esposito*, our courts steadfastly have applied this standard in determining whether such claims are reviewable. See *State* v. *Ross*, 269 Conn. 213, 231–32, 849 A.2d 648 (2004) ("we agree with numerous other courts throughout the nation that 'it is reversible error for a trial court to force an accused to use peremptory challenges on persons who should have been excused for cause, *provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied*'" [emphasis in original]); *State* v. *Kelly*, 256 Conn. 23, 32

n.8, 770 A.2d 908 (2001) ("our rule remains in accordance with the vast majority of jurisdictions that have considered this issue, which have required a defendant to exhaust his peremptory challenges before claiming error in the trial court's denial of his challenges for cause").

In the present case, after exhausting his peremptory challenges, the defendant did not seek to exercise an additional peremptory challenge against a specific juror. The defendant exhausted his peremptory challenges on the morning of the last day of voir dire. Later that day, after the parties had questioned K.S., defense counsel noted that "we don't have any peremptory challenges left" and then moved to remove K.S. for cause, which the court denied. The defendant never requested an additional peremptory challenge, nor did the court ever deny such a request. Simply stating that he had exhausted his peremptory challenges does not constitute a request to the court for additional challenges. See *State* v. *Mourning*, 104 Conn. App. 262, 281, 934 A.2d 263 (defense counsel's statement that he is out of peremptory challenges and subsequent reluctant acceptance of juror does not constitute request for additional challenges), cert. denied, 285 Conn. 903, 938 A.2d 594 (2007).

Furthermore, in his reply brief, the defendant argues that applying *Esposito* to this case ignores the rationale of its holding. More specifically, the defendant argues that the fact that he made it clear to the court that he would have used peremptory challenges to excuse K.S. and E.C. if he had any left serves the purpose of the *Esposito* rule, regardless of whether the defendant made an explicit request for additional peremptory challenges. We are not persuaded by this argument. Had the court in *Esposito*, and its progeny, intended that it would be considered sufficient for the mere expression

that a peremptory challenge would be used, then language appropriate to effectuate that intention would have been crafted.

## II

The defendant also claims that he was denied his constitutional right to a fair trial due to prosecutorial impropriety. Specifically, he claims that the prosecutor committed impropriety at trial by eliciting (1) evidence of the defendant's subsequent drug arrest during the direct examination of Apicella and cross-examination of the defendant, and (2) a statement of Smith, a coconspirator, during the examination of Apicella, and referring to that evidence during closing argument. In response, the state contends that the defendant's claims are not reviewable because they are merely evidentiary claims disguised as claims of prosecutorial impropriety. We agree with the state's characterization of the defendant's claims as evidentiary rather than constitutional claims of prosecutorial impropriety under the specific facts of this case. Accordingly, we will not review the merits of the defendant's claim.

The following additional facts are relevant to the resolution of this claim. During cross-examination of Apicella, a state's witness, defense counsel introduced as a full exhibit the arrest warrant application for the defendant. Paragraph eight of the warrant application contained portions of the defendant's criminal history, including prior arrests and convictions of possession of narcotics and sale of narcotics. During questioning, defense counsel asked Apicella whether he ever had personally searched for or found drugs on the defendant. In response to those inquiries, Apicella testified that he never had found drugs on the defendant but did once find a gun on him for which he was arrested. Regarding the six week gap between the undercover drug sale in March, 2009, and the defendant's arrest in

May, 2009, defense counsel asked, "So, you left [the defendant] there for another month or so to continue to sell drugs?" to which Apicella replied: "That [would] depend on [the defendant's] conduct."

On redirect examination, the prosecutor engaged in the following colloquy with Apicella:

"[The Prosecutor]: Now, you indicated [in] your answers to [defense counsel] that you would hope that [the defendant] wouldn't sell drugs. Isn't it a fact that [the defendant] was arrested for drugs within that same area on August 12, 2009?

"[The Witness]: In August, right in that area, sir, yes.

"[The Prosecutor]: And that was also by the vice and intelligence unit, correct?

"[The Witness]: It was, sir.

"[The Prosecutor]: That was based on an undercover buy with a [confidential informant], correct?

"[The Witness]: A confidential buy, yes sir.

"[The Prosecutor]: And he was arrested after [the defendant] sold to a confidential informant?

"[Defense Counsel]: I'm going to object. The state is leading the witness and testifying. That's not asking a question. . . .

"[The Prosecutor]: Tell me about [the defendant's]— I'll withdraw, Your Honor—August 12, 2009 arrest, sir?

"[The Witness]: As a result of a drug investigation that was conducted on [the defendant], a search warrant was obtained for [the defendant]. In fact, he was apprehended at North Main and Division, which is right there. I believe he also was apprehended with a quantity of drugs."

On recross-examination of Apicella, defense counsel revisited the defendant's August, 2009 arrest and again sought to establish that the defendant did not have a drug history:

"[Defense Counsel]: Okay. And you indicated that [the defendant] had been arrested in August of 2009, but this incident here occurred in March. Have you arrested him prior to March? Have you arrested him prior to March for narcotics?

"[The Witness]: Yes, ma'am.

"[Defense Counsel]: For the sale of narcotics?

"[The Witness]: Me, personally, no. He's been arrested before, but not by me."

On redirect examination of Apicella, the state referred to the defendant's arrest warrant, which was marked as defendant's exhibit E, and elicited that the defendant had been convicted of several felonies, including charges for the sale and possession of narcotics. Thereafter, during the state's cross-examination of the defendant, he denied that he had ever been stopped by the police in the area of the undercover buy. The prosecutor then asked whether the defendant was arrested in that area on August 12, 2009. Defense counsel objected on the ground of relevance, and the court sustained the objection. The state made no reference during closing argument to the defendant's August arrest.

As to the evidence concerning the statements of Smith, during the cross-examination of Apicella, defense counsel sought to establish that Apicella could not be certain that money or drugs were exchanged between Smith and the defendant at the time of the drug buy. As part of that inquiry, defense counsel elicited evidence regarding the statement that Smith had given to the police as follows:

"[Defense Counsel]: Did you ever see [the defendant] hand any drugs to Mrs. Smith?

"[The Witness]: I did not, personally, no, ma'am.

"[Defense Counsel]: Did you personally see Mrs. Smith hand [the defendant] money?

"[The Witness]: I saw her hand him something.

"[Defense Counsel]: You don't know what it was?

"[The Witness]: Yes, I do. It was actually money.

"[Defense Counsel]: How do you know it was money? Could you see the money?

"[The Witness]: I know it from the observations of another officer. I know it from his coconspirator's statement; I know that to be money.

"[Defense Counsel]: You're relying on statements of others. You didn't see money in his physical hand?

"[The Witness]: No, ma'am. I'm relying on the direct digital observation of others, coconspirator's statements, and that's how I come to my conclusion. Plus, I saw [her] own actions myself. And I would reasonably conclude that what she just handed him, based on all of the information, the totality of the circumstances, it was money."

On redirect examination, the state addressed the topic of Smith's statement in the following colloquy with Apicella:

"[The Prosecutor]: Now, there were questions about how you know [the defendant] did actually make this transaction with Mrs. Smith and Officer Wilcox. You indicated there was a statement taken from Mrs. Smith, who was also arrested in this case?

"[The Witness]: That's correct.

"[The Prosecutor]: To your knowledge, was she also convicted?

"[The Witness]: Yes. . . .

"[The Prosecutor]: Showing you what's been marked state's exhibit 12 for identification purposes, could you identify that for the record please, sir?

"[The Witness]: Yes. The statement was given by Ida Mae Smith on May 7.

"[The Prosecutor]: Does that indicate that she was working as a runner with [the defendant]?

"[The Witness]: She says yes, I am [a] runner.

"[The Prosecutor]: And that's Mrs. Smith's statement?

"[The Witness]: Yes. She said the dealer I usually work for is a black guy who I also know as Belay.

"[The Prosecutor]: And is [the defendant] also known as Belay?

"[The Witness]: [The defendant] is Belay.

"[The Prosecutor]: I offer it as a full exhibit.

"The Court: Do you have an objection?

"[Defense Counsel]: I object to it being a full exhibit. She's not here to cross-examine. It was her statement. It shouldn't come in as a full exhibit. It's prejudicial and we have no way to cross-examine her as to the statement [or] the conditions under which the statement was given. It's signed May 7 after she was arrested. We don't know if there was anything given in exchange for her statement.

"[The Prosecutor]: Your Honor, she brought it up. It was brought up through her cross-examination. I will withdraw the offer, Your Honor."

Thus, any objections that the defendant made during these colloquies were either sustained or resulted in the objected to offer being withdrawn. Furthermore, defense counsel made no objections during the state's closing argument to the jury when the prosecutor referenced the statements of Smith.[2]

It is apparent to us from a review of the record that the defendant is attempting to assert his unpreserved and nonconstitutional evidentiary claims through the guise of claims of prosecutorial impropriety with constitutional implications. See *State* v. *Blango*, 103 Conn. App. 100, 113, 927 A.2d 964, cert. denied, 284 Conn. 919, 933 A.2d 721 (2007). "Although our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the [factors of *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)], that rule does not pertain to mere evidentiary claims masquerading as constitutional violations." *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007); see also *State* v. *Rowe*, 279 Conn. 139, 149, 900 A.2d 1276 (2006) (unpreserved and unreviewable evidentiary claim cannot be transformed into one of prosecutorial impropriety). The defendant has not removed the unobjected to testimony, which he attempts to transform into prosecutorial impropriety, from the realm of purely eviden-

---

[2] During the state's closing argument, the prosecutor referred to Smith's statements as follows: "But in this case you have [Officer Eric] Medina and Apicella indicate to you that in the drug trade people use runners. And when Lieutenant Apicella was asked by defense counsel, attorney [Stephanie L.] Evans, asked, what other evidence do you have besides the officer's testimony in this case, he says, and I quote, 'we have Mrs. Smith give a statement that says she was working as a runner for [the defendant].' That's accessory. That's conspirator. But their testimony is crucial. Tell you about the customary practices of drug dealers, why they use other individuals to avoid detection. And you will have that testimony. If you need it read back, have it read back. But that is the customary practice to avoid detection—use other people. One person orders, takes the order, the other person holds the product, holds the money and the transactions are done."

tiary claims.[3] Accordingly, we decline to review these claims.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[3] It should also be noted that evidentiary claims do not merit review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because they are not of constitutional magnitude. "[R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Rosario*, 99 Conn. App. 92, 99 n.6, 912 A.2d 1064, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007).