STATE OF CONNECTICUT *v.* MARLIK A. MOURNING
(AC 27821)

DiPentima, Gruendel and Hennessy, Js.

Argued March 14—officially released October 30, 2007

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*Toni M. Smith-Rosario,* assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Patrick J. Griffin* and *Jason Germain,* assistant state's attorneys, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Marlik A. Mourning, appeals from the judgments of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a, and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c. On appeal, the defendant claims that (1) the evidence was insufficient to sustain his conviction of conspiracy to commit murder and the jury's verdict was legally inconsistent, (2) the trial court improperly failed to conduct an inquiry into a witness' assertion of his fifth amendment privilege against self-incrimination, (3) the court improperly denied admission into evidence of the witness' written statement to police, (4) the court improperly denied the defendant's for cause challenges to potential jurors during voir dire and (5) the court improperly charged the jury on the

elements of conspiracy to commit murder. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In the late evening of July 8, 2003, Lamar Daniels, Deshon Thomas and the defendant gathered in front of an establishment named Cobra's Place in what is known as the Sugar Bowl area of Waterbury, where the defendant and Daniels often sold drugs. There they engaged in an argument with Desmond Williams and the victim, Trevor Salley, who recently had completed a sale in the area. After the argument ended, the individuals dispersed, and Daniels called his cousin, Sherita Norman, requesting that she pick him up. Several minutes later, Norman and her sister, Sharon Norman, arrived and drove Daniels and the defendant away from the Sugar Bowl and back to Sherita Norman's apartment. Daniels entered the apartment and retrieved a silver .38 caliber revolver and an AK-47 assault rifle from a bedroom closet. At some point, Daniels handed the .38 caliber revolver to the defendant. Sherita Norman then drove the defendant and Daniels back to the Sugar Bowl and parked in a lot, enclosed by a fence, located behind Cobra's Place. As the defendant and Daniels approached the fence, they saw the victim and Williams. Daniels called out to them and displayed the rifle, at which point the victim and Williams ran in the opposite direction. Daniels discharged the AK-47 assault rifle several times. The defendant then fired the .38 caliber silver revolver. The gunshot that killed the victim came from the .38 caliber silver revolver fired at the scene.

The defendant subsequently was charged by information with murder, conspiracy to commit murder and criminal possession of a pistol or revolver. After a jury trial, the defendant was found guilty of manslaughter in the first degree with a firearm, conspiracy to commit murder and criminal possession of a pistol or revolver.

This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant claims that the court improperly denied his motion for a judgment of acquittal because the evidence was insufficient to sustain his conviction of conspiracy to commit murder.[1] In a related claim, the defendant argues that the conviction of conspiracy to commit murder and manslaughter in the first degree with a firearm constituted an inconsistent verdict. We disagree with both claims.

## A

Our Supreme Court has set forth the well settled standard of review for a claim challenging the sufficiency of the evidence:[2] "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the

[1] We review the defendant's sufficiency of the evidence claim first because that claim, "if successful, would necessitate the entry of a judgment of acquittal . . . ." (Citation omitted.) *State* v. *Murray*, 254 Conn. 472, 478, 757 A.2d 578 (2000).

[2] Although the defendant did not preserve his claim, we afford review because it implicates his constitutional right not to be convicted on insufficient proof. See, e.g., *State* v. *Morgan*, 70 Conn. App. 255, 281, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . [A]ny such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence." (Internal quotation marks omitted.) *State* v. *Aloi*, 280 Conn. 824, 842–43, 911 A.2d 1086 (2007).

"To establish the crime of conspiracy to commit murder, the state must show that there was an agreement between two or more persons to cause the death of another person and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . In addition, the state also must show that the conspirators intended to cause the death of another person."[3] (Citation omitted.) *State* v.

---

[3] Upon objection by the defendant during the court's charge to the jury, the court clarified that the crime that the defendant and Daniels intended to commit was murder. See part V.

*Sanchez*, 84 Conn. App. 583, 588, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004). "The existence of a formal agreement between the parties need not be proved. It is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of a conspiracy, a conviction is usually based on circumstantial evidence. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement." (Citations omitted; internal quotation marks omitted.) *State* v. *Crump*, 43 Conn. App. 252, 258, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996).

In this case, the jury heard ample evidence from which it could have concluded that the defendant and Daniels conspired to murder the victim. On the date of the murder, the defendant and Daniels had an argument in front of Cobra's Place with the victim and Williams regarding an alleged drug sale. There was testimony that after the argument, Daniels was heard saying that "those niggers got to go" and that "somebody's gonna feel this shit tonight." The defendant, though remaining quiet, appeared equally upset. The Normans drove the defendant and Daniels from the scene of the argument to Sherita Norman's apartment where Daniels retrieved two loaded guns from a bedroom closet and handed one to the defendant. The Normans then drove the defendant and Daniels back to the area of Cobra's Place. The defendant stood next to Daniels when the latter fired his weapon in the direction of the victim and Williams. The weapon that was determined to have killed the victim was the one that the defendant had been carrying. Both the defendant and Daniels fled the scene together once the victim had been shot.

From these facts, the jury reasonably could have found that the defendant and Daniels agreed to cause

the death of the victim and committed an overt act in furtherance thereof. In addition, the jury reasonably could have determined that the defendant and Daniels intended to cause the death of the victim. "In considering whether the evidence fairly supports a jury's finding of guilt, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 542, 679 A.2d 902 (1996). Accordingly, we conclude that sufficient evidence was offered to convict the defendant of the crime of conspiracy to commit murder.

## B

In a related claim, the defendant argues that the jury's guilty verdict of conspiracy to commit murder and of manslaughter in the first degree with a firearm is legally inconsistent.[4] Specifically, he claims that the verdict's legal inconsistency is evident because the intent to kill and the intent to cause serious physical injury are contradictory elements. We note that "[t]he resolution of a claim of inconsistent verdicts presents a question of law. . . . Our review is therefore plenary." (Citation omitted.) *State* v. *Flowers*, 85 Conn. App. 681, 694, 858 A.2d 827 (2004), rev'd on other grounds, 278 Conn. 533, 898 A.2d 789 (2006).

"The issue of legal inconsistency typically arises when a defendant is convicted of two offenses that contain contradictory elements. Such verdicts are legally inconsistent if the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted." (Internal quotation

---

[1] The defendant's motion for a judgment of acquittal properly preserved his claim of a legally inconsistent verdict.

marks omitted.) *State* v. *Knight*, 266 Conn. 658, 667, 835 A.2d 47 (2003). The elements necessary to convict the defendant of conspiracy to commit murder have been set forth in part I A and include the intention to cause the death of another. See *State* v. *Sanchez*, supra, 84 Conn. App. 588. To convict the defendant of manslaughter in the first degree with a firearm, "the state must prove that the defendant, (1) *with the intent to cause serious physical injury to another person*, (2) caused the death of such person or a third person (3) using, or threatening to use by displaying or representing by his words or conduct, that he possesses a firearm." (Emphasis added.) *State* v. *Smith*, 73 Conn. App. 173, 180, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002).

Although the specific intents necessary for both crimes are not identical, appellate precedent dictates that the two are not mutually exclusive. See, e.g., *State* v. *Williams*, 237 Conn. 748, 679 A.2d 920 (1996), on remand, 44 Conn. App. 231, 689 A.2d 484, cert. denied, 240 Conn. 918, 692 A.2d 815 (1997). The defendant in *Williams* had been convicted of both attempt to commit murder and assault in the first degree for having punched the victim and having hit her repeatedly over the head with a baseball bat, ultimately causing her death. Id., 749, 751. He claimed that the intent to cause death and the intent to cause serious physical injury were mutually exclusive states of mind. Id., 749. Our Supreme Court concluded that "under the appropriate circumstances, a defendant can simultaneously intend to cause the death of, and intend to cause serious physical injury to, the same victim. . . . The jury reasonably could have inferred from the defendant's conduct that he had possessed, at the same time and by the same acts, the intent to cause the victim's death and the intent to cause the victim serious physical injury while he

was attempting to kill her." (Citations omitted; internal quotation marks omitted.) Id., 757.

The defendant attempts to distinguish *Williams* by emphasizing that it involved repeated hits with a baseball bat while this case concerns a single deadly gunshot, and "[f]rom that one action, it would be unreasonable to conclude that the defendant simultaneously possessed the intent to kill and the intent to cause serious physical injury." We note, however, that gradations of specific intent for purposes of a claim of legal inconsistency represent a distinction without a difference. See, e.g., *State* v. *Murray*, 254 Conn. 472, 483, 757 A.2d 578 (2000) ("one cannot intend to cause death without necessarily intending to cause a physical injury"); cf. *State* v. *King*, 216 Conn. 585, 593–94, 583 A.2d 896 (1990) (jury could not find defendant guilty on count of attempt to commit murder and guilty on count of assault in first degree because "statutory definitions of 'intentionally' and 'recklessly' are mutually exclusive and inconsistent"), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991).

"Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *DeJesus*, 236 Conn. 189, 197, 672 A.2d 488 (1996). Because the intent required for conviction of conspiracy to commit murder and the intent necessary for a conviction of manslaughter in the first degree with a firearm are not contradictory, the jury's conclusion is not unreasonable, and the defendant's claim of legal inconsistency of the verdict fails.[5]

---

[5] The defendant also appears to claim that the verdict is *factually* inconsistent because the jury found him not guilty of murder, yet found him guilty of the lesser included offense of manslaughter in the first degree with a firearm, thus finding that he did not have the requisite intent to cause death, but rather, the intent to cause serious physical injury. He claims that those not guilty findings cannot be reconciled with his conviction of conspiracy to commit murder, which necessarily requires the intent to cause death. We note, however, that "[a] factually inconsistent verdict will not be over-

## II

The defendant raises multiple claims concerning the assertion by a witness, Clifford Wynn, of his fifth amendment privilege against self-incrimination. The following facts are relevant to our consideration of these claims.

Wynn was an inmate at New Haven Correctional Center during the investigation of the death of Salley. Sergeant Scott Stevenson of the detective bureau of the Waterbury police department testified that he received a telephone call from the department of correction that an inmate, later identified as Wynn, had information regarding the shooting of Salley. Specifically, Wynn claimed that he witnessed the shooting and that someone other than the defendant was the shooter. Wynn eventually met with detectives and made an official statement. The defendant sought to call Wynn as a witness and to introduce his statement into evidence at trial.

Prior to Wynn's taking the witness stand, the court and defense counsel had a discussion off the record, after which the jury was excused and the court called Wynn to the stand. The court asked Wynn if he had any concerns regarding testifying. When he responded, "I need my rights," the court read Wynn his rights and asked him specifically if he thought any questions he might have to answer would be incriminating. The court informed him that if that was the case, he would have the right to invoke his fifth amendment privilege against self-incrimination. Wynn stated that he understood and

turned on appeal. On several occasions, [our Supreme Court] has refused to reverse a verdict of guilty on one count where that verdict appeared to be inconsistent with a verdict of acquittal on another count. . . . The law permits inconsistent verdicts because of the recognition that jury deliberations necessarily involve negotiation and compromise." (Internal quotation marks omitted.) *State* v. *Knight*, supra, 266 Conn. 670. We thus conclude that the defendant's apparent claim of factual inconsistency of the verdict is without merit.

that he had concerns. The court reexplained the fifth amendment privilege and its purpose, and Wynn stated that he had no concerns. The court gave both counsel the opportunity to question the witness and both declined. The court again asked Wynn if he had any concerns or questions he wanted to ask of the court before the jury returned, to which he replied that he had been questioned several times, but had not been able to speak with a lawyer. The court asked Wynn if he would like to speak to a lawyer before answering any questions, and he replied in the affirmative. Defense counsel then requested the opportunity to voir dire Wynn. The court granted this request and allowed both defense counsel and the prosecutor to voir dire Wynn. At the conclusion of voir dire, the court recessed to find an attorney with whom Wynn could speak before having him testify in the case. The court reconvened, and Wynn retook the witness stand after speaking with an attorney.

When Wynn had retaken the witness stand, the court heard from Wynn's newly appointed attorney, who informed the court that having met with Wynn and having had a "very, very good interchange in terms of what we thought would be the appropriate action to take," he had advised Wynn that he should claim his privilege as to all questions asked of him. The court then allowed defense counsel to inquire. During counsel's inquiry and prior to Wynn's assertion of his fifth amendment privilege, defense counsel, in an attempt to ascertain Wynn's motive for not testifying, asked Wynn whether he had been having problems in jail and whether he had been threatened in jail. Wynn responded to both questions affirmatively. Next, defense counsel asked Wynn whether he had told Sergeant Stevenson that he had been threatened. Before Wynn could respond, his appointed attorney interjected to advise his client to assert his fifth amendment privilege to this

and all other questions. Wynn did not respond to this question either by answering it or by asserting his fifth amendment privilege. After some discussion between the court and counsel regarding the relevance of the questions asked and whether they were questions to which Wynn could validly assert his privilege, defense counsel began to inquire again. Defense counsel asked Wynn if he had been jumped in prison, and Wynn asserted his fifth amendment privilege to this question. Defense counsel objected to Wynn's assertion, and the court overruled the objection. There was no further inquiry by defense counsel.

A

The defendant claims that the court failed to "[hear] a voir dire conducted by trial counsel of the proposed questions and area of inquiry so that the court could make a determination if such testimony would possibly have a tendency to incriminate . . . ." The defendant argues that the failure of the court to hold a voir dire amounted to an acceptance of a blanket assertion in violation of the defendant's constitutional right to compulsory process to produce witnesses in his behalf under the sixth amendment to the federal constitution and article first, § 8, of the state constitution. Although such a claim may be raised on appeal,[6] the record in the present case is inadequate for review.

It is axiomatic that appellants bear the burden to provide this court with an adequate record for review. See Practice Book § 61-10. As we have noted, "[s]peculation and conjecture have no place in appellate review." *Narumanchi* v. *DeStefano*, 89 Conn. App. 807, 815, 875 A.2d 71 (2005). In the present case, after Wynn

---

[6] See *State* v. *Cecarelli*, 32 Conn. App. 811, 820, 631 A.2d 862 (1993) (holding that trial court improperly accepted blanket assertion of witness' fifth amendment privilege from witness' attorney without having witness take witness stand thereby delegating its authority to witness' attorney).

asserted his fifth amendment privilege, the defendant neither asked the court to conduct a voir dire, nor objected on the ground that a voir dire was not allowed. When Wynn asserted his privilege, defense counsel requested that the court either force the witness to testify or grant the witness immunity. The court refused to do either but invited further inquiry from defense counsel.[7] Defense counsel did not inquire further. Because defense counsel did not pursue further questioning or request an evidentiary hearing, it is impossible for this court to tell, without speculating, whether the trial court would have denied defense counsel an opportunity to voir dire such that it amounted to an acceptance of a blanket assertion of Wynn's privilege.

## B

The defendant also claims that Wynn asserted an invalid fifth amendment privilege against self-incrimination that deprived the defendant of his constitutional right to compulsory process to produce witnesses in his behalf under the sixth amendment to the federal constitution. This claim is preserved only with regard to the question to which Wynn asserted his fifth amendment privilege, namely, whether he had been jumped in jail.[8]

Because a valid fifth amendment privilege against self-incrimination will always prevail over a defendant's right to compel testimony on his behalf; *State* v. *Simms*,

---

[7] In response to defense counsel's request that Wynn be forced to testify or be granted immunity to testify, the court replied: "I will not go behind the reasons why counsel and his client have elected to invoke their fifth amendment privilege, so I will not force the witness to testify, nor indicate that the state should give immunity, nor sua sponte grant immunity from the court. Anything else?" Defense counsel responded: "No, nothing from the defense, Your Honor."

[8] Whether Wynn had a valid fifth amendment privilege to assert regarding the statement he gave to police cannot be reviewed, as those questions were never asked.

170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976); it first must be ascertained whether Wynn had a valid fifth amendment privilege to assert. If Wynn's privilege is valid, the defendant's sixth amendment claim must give way, and he will have failed to state a constitutional claim on appeal. Id., 209–10.

A ruling on the validity of a witness' fifth amendment privilege is an evidentiary determination that this court will review under the abuse of discretion standard. As our Supreme Court has stated: "It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion." (Citation omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 368–69, 788 A.2d 496 (2002). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) *State* v. *Simms*, supra, 170 Conn. 209. Put another way, in order for the trial court to find that the witness does not have a valid privilege, "it must be *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate the witness. . . . The right of the privilege does not depend upon the likelihood of prosecution but upon the possibility of prosecution." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Giraud*, 258 Conn. 631, 640, 783 A.2d 1019 (2001).

In the present case, it was not perfectly clear from all the circumstances that the answers could not possibly

have a tendency to incriminate the witness. Before Wynn testified, Stevenson testified that the police doubted the veracity of Wynn's statement for several reasons, including (1) Wynn's attempt to obtain a release from prison in exchange for his statement, (2) Wynn's having been incarcerated with the person whom he claimed to be the shooter, (3) the inconsistency of Wynn's statements with other witness statements and (4) the fact that no other witness identified Wynn as being at the scene of the shooting. Because the possibility of prosecution is sufficient for a valid fifth amendment privilege to exist, the court did not abuse its discretion in ruling that Wynn had a valid privilege to assert. Therefore, the defendant's sixth amendment right to compel testimony must yield to Wynn's valid fifth amendment privilege, and the defendant's claim thus fails.

C

In the alternative, the defendant claims that even if Wynn had a valid privilege, the court either should have ordered the state to grant immunity or should have granted the witness immunity sua sponte. Additionally, the defendant claims that the court's failure to rule in the defendant's favor excluded evidence necessary to the defendant's defense and thus violated the defendant's right to compulsory due process under the sixth amendment to the federal constitution. "The issue of whether a defendant's rights to due process and compulsory process require that a defense witness be granted immunity is a question of law and, thus, is subject to de novo review." *State* v. *Holmes*, 257 Conn. 248, 252, 777 A.2d 627 (2001), cert. denied, 535 U.S. 939, 122 S. Ct. 1321, 152 L. Ed. 2d 229 (2002). We conclude that the court did not act improperly in not granting either request.

General Statutes § 54-47a grants the prosecutor, and not the court, the authority to compel the testimony of

any witness through a grant of immunity. The defendant's claim, therefore, that the court should have granted Wynn immunity sua sponte is incorrect according to applicable state law. The defendant also refers to an alternative theory of granting immunity, the so-called "effective defense theory." Under this theory, the court presumably could order the prosecutor to grant a witness immunity when the witness' testimony will be clearly exculpatory and clearly necessary in that it is material yet not cumulative, and where the prosecutor does not have a strong interest in withholding immunity. *State* v. *Holmes*, supra, 257 Conn. 255. Although recognized as a theory for granting immunity, our Supreme Court has never applied this theory. In addition, our Supreme Court has noted that "[t]he effective defense theory has not been well received by the other Circuit Courts of Appeals. . . . [They] have found this theory to implicate separation of powers principles." (Citation omitted.) Id., 255 n.7. The legislature has granted the prosecutor the power of providing immunity to witnesses, but has not granted such power to the court.

The defendant argues that Wynn's testimony was clearly exculpatory and clearly essential to the defense in that Wynn was the only witness who supported the defense theory of the case: that someone other than the defendant was the person who fired the fatal gunshot. We conclude, however, that Wynn's testimony was not clearly essential to the defendant's case in that it would have been cumulative. As noted in part II B, on direct examination, Stevenson testified that Wynn had made a written statement that he had witnessed the shooting and that someone other than the defendant was the shooter. Further, Stevenson testified on direct examination as well as on cross-examination about the contents of Wynn's statement regarding where Wynn would have been standing and how Wynn described

the events that had transpired. As a result, the evidence that the defendant wanted to present to the jury through Wynn had already been admitted through Stevenson. We therefore cannot say that the court's denial of the defendant's request was improper.

## III

The defendant next claims that the court improperly ruled that Wynn's statement should not be admitted into evidence under the residual hearsay exception. "It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and [our appellate courts] will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion." (Citation omitted.) *Pestey* v. *Cushman*, supra, 259 Conn. 368–69. We conclude that the court did not abuse that discretion.

Once Wynn asserted his fifth amendment privilege not to testify, defense counsel attempted to enter into evidence Wynn's written statement to police regarding his version of the events that transpired on the evening of the incident. Under our rules of evidence, hearsay is "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted." Conn. Code Evid. § 8-1 (3). Wynn's statement to police was one he made other than while testifying, and it was being offered to establish the truth of the content of the statement. Wynn's statement, therefore, was hearsay and could not be admitted into evidence unless it met the requirements for a hearsay exception, specifically, the residual hearsay exception. Under the residual hearsay exception, a hearsay statement that is not otherwise admissible under any of the other exceptions is admissible if the court determines that "(1) there is a reasonable necessity for the admission of the statement,

and (2) the statement is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." Id., § 8-9.

Here, the court could have found that either the admission of the statement was not reasonably necessary or that it was not supported by equivalent guarantees of trustworthiness. Up to that point in the trial, the court had already heard testimony from Stevenson that Wynn claimed to have witnessed the shooting and had made a written statement identifying someone other than the defendant as the shooter. Because this testimony was already before the jury, the court may have found that Wynn's statement was not reasonably necessary. More importantly, however, Stevenson had testified that the police attempted to corroborate Wynn's statement of the events to no avail, that prior to giving his statement, Wynn had been incarcerated with the person whom he claimed to be the shooter and that Wynn had been looking to cooperate in an attempt to lighten his own sentence. From Stevenson's testimony, therefore, the court could have found that Wynn's statement was not supported by equivalent guarantees of trustworthiness and reliability. The court, therefore, did not abuse its discretion by not allowing Wynn's statement into evidence.

## IV

The defendant claims that he was forced to use his peremptory challenges to strike certain potential jurors during voir dire because the court improperly denied four for cause challenges. He claims specifically that, as a result of using his peremptory challenges to strike potential jurors who should have been stricken for cause, he was left with an insufficient number of

peremptory challenges with which to strike venire-person $T^9$ when he was originally seated as an alternate juror.

"[I]t is reversible error for a trial court to force an accused to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied." (Internal quotation marks omitted.) *State* v. *Esposito*, 223 Conn. 299, 313, 613 A.2d 242 (1992). In the present case, however, upon accepting T as an alternate juror, defense counsel stated, "[w]ell, Your Honor, I am out of challenges, so I have none for cause; I suppose I accept him." Although he reluctantly accepted T, defense counsel conceded that he had no reason to challenge T for cause, and he failed to ask for an additional peremptory challenge. Because the defendant failed to challenge T for cause, or to request an additional challenge, we do not reach the question of whether the for cause challenges earlier denied were improperly denied because we do not know for sure whether the defendant would have stricken T at the time T was seated as an alternate juror.

Furthermore, the court did not abuse its discretion by denying the defendant the opportunity to use a newly gained peremptory challenge to strike T retroactively once T's status changed from that of alternate juror to that of regular juror.

During the jury selection process, the court excused a total of three regular jurors and one alternate. The court seated the remaining alternates, including T, as regular jurors in order to replenish the regular jury panel. The court then resumed jury selection in order to select three additional jurors to serve as alternates.

---

[9] See *State* v. *Kelly*, 256 Conn. 23, 30 n.4, 770 A.2d 908 (2001) ("[w]e use the initials of . . . venirepersons to protect their privacy").

Each side was given one additional peremptory challenge for this selection process. Defense counsel sought to use this newly gained peremptory challenge to retroactively strike T, who had by this time become a member of the regular jury. This request was denied.

"[W]hen the examination is on the voir dire, a party has no right to a peremptory challenge after he has accepted a juror upon the conclusion of his examination; but the court, where the ends of justice so require, may in its discretion permit such a challenge to be made at any time before the jury is sworn." (Internal quotation marks omitted.) *Walczak* v. *Daniel*, 148 Conn. 592, 596–97, 172 A.2d 915 (1961). Moreover, "once a juror is accepted, with opportunity for exercise of a peremptory challenge, he may not later be challenged except for cause later appearing." *DeCarlo* v. *Frame*, 134 Conn. 530, 534, 58 A.2d 846 (1948). As explained previously, the defendant neither challenged T for cause nor requested an additional peremptory challenge with which to strike T at the time he was seated as an alternate juror. Nothing about T had changed from the time he had been impaneled as an alternate to the time he was moved to the regular jury. T's change of status from alternate to regular jury member does not, as the defendant suggests, change anything about T's ability to be a fair and impartial juror. The court, therefore, did not abuse its discretion in denying the defendant the opportunity to strike T retroactively.

V

The defendant claims that he was deprived of his right to a fair trial because the court failed to instruct the jury that the crime of conspiracy to commit murder requires the specific intent to cause the death of another. We conclude that, read as a whole, the jury charge was not improper.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Michael T.*, 97 Conn. App. 478, 483–84, 905 A.2d 670, cert. denied, 280 Conn. 927, 909 A.2d 524 (2006).

When charging the jury on the conspiracy to commit murder charge, the court first instructed on the elements of conspiracy generally by quoting the statutory language, stating: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance [of] such conspiracy. To constitute the crime of conspiracy, the state must prove the following elements beyond

a reasonable doubt: one, there was an agreement between the defendant and one or more persons to engage in conduct constituting a crime. Two, there was an overt act and furtherance of [the] subject of the agreement by any one of those persons. And, three, *there was intent on the part of the defendant that conduct constituting a crime be performed.*" (Emphasis added.)

The court further explained each element of the crime in greater detail and, as to the intent element, instructed that "[i]f you find that there was an agreement to engage in conduct constituting a crime [and] that the agreement was followed by an act or acts directed to achieve or further the objective of the conspiracy, you must still determine whether the defendant had criminal intent. The defendant may not be found guilty unless the state has proven beyond a reasonable doubt that he had *specific intent to violate the law when he entered into the agreement to engage in conduct constituting a crime.*" (Emphasis added.)

After the charge was read to the jury, defense counsel objected to the conspiracy charge. Counsel argued that by charging that the intent was the "intent on the part of the defendant that conduct constituting a crime be performed," the court failed to align the conspiracy count with the crime of murder and so confused and misled the jury. Defense counsel argued that the jury should have been instructed that conspiracy to commit murder required an agreement to commit murder, an overt act in furtherance of the agreement to commit murder and the intent to commit the crime of murder. The court then recharged the jury on the conspiracy charge, adding that the crime the state alleged was the object of the conspiracy was the crime of intentional murder.[10] The court recharged as follows: "To constitute

---

[10] Prior to the court's recharging the jury, defense counsel objected to the proposed recharge on the same grounds as in his first objection.

the crime of conspiracy, the state must prove the following elements beyond a reasonable doubt: there was an agreement between the defendant and one or more persons to engage in conduct constituting a crime. *This is the additional part, [t]he crime the state alleges is the object of the conspiracy is the crime of intentional murder.* Two, that there was an overt act . . . in furtherance of the subject of the agreement by any one of those parties . . . and three, *there was intention on the part of the defendant [that] the conduct constituting the crime be performed.*" (Emphasis added.)

Defense counsel objected to the recharge on the same grounds as the original objection. After the recharge, the jury sent a note to the court, asking whether it would be possible for the court to define conspiracy in layman's terms because the jury was having "some confusion and different interpretations of the definition." In response, the court recharged the jury on conspiracy to commit murder as follows: "[T]he crime of conspiracy has four essential elements, which are: one, two or more persons reached an agreement or came to an understanding to engage in conduct constituting a criminal act. *Here, to commit the crime of intention[al] murder as I have defined that crime for you in § 27 at pages thirty-seven and thirty-eight of the jury charge,* the agreement or understanding does not have to be an expressed or formal agreement. Two, the defendant voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or at some later time while it was still in effect. Three, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding. And, four, while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did an act for the purpose of carrying out or carrying

forward the agreement or understanding." (Emphasis added.)

The court defined intentional murder in § 27 of the jury charge as follows: "A person is guilty of murder when with intent to cause the death of another person he causes the death of such person . . . ." (Internal quotation marks omitted.) In addition, the instruction names the victim as the object of the crime.[11]

The essential elements for the crime of conspiracy are well established. General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy." (Internal quotation marks omitted.) *State* v. *Beccia*, 199 Conn. 1, 3–4, 505 A.2d 683 (1986). Thus, "[p]roof of a conspiracy to commit a specific offense requires proof that the conspirators *intended* to bring about the elements of the conspired offense." (Emphasis in original; internal quotation marks omitted.) Id., 5. The state, therefore, in order to prove the offense of conspiracy to commit

---

[11] Defense counsel objected to the recharge on two grounds. First, he claimed that the court's recharge broke the crime down into four elements as opposed to three and, second, he claimed that the charge failed to instruct the jury that in order to find the defendant guilty of conspiracy to commit murder, the jury must be convinced beyond a reasonable doubt that the defendant intended to cause the death of the victim.

During the colloquy between the court and counsel and outside the presence of the jury, the court stated that although intending that the victim die is an element of the crime of intentional murder, it is not an element of the crime of conspiracy. The state concedes that this was an incorrect statement of the law, and we agree. Nevertheless, because the statement was made outside the presence of the jury, it could not have had an impact on the deliberations of the jury and did not affect the correct instruction that the court ultimately gave.

murder, "must prove two distinct elements of intent: that the conspirators intended to agree; and that they intended to cause the death of another person." *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992). Because these two distinct elements of intent to conspire to commit murder are required to be found by the jury beyond a reasonable doubt, it is essential that the jury instructions charge the jury accordingly. Although the original charge did not sufficiently charge the jury on the specific intent required to find the defendant guilty of conspiracy to commit murder, the court's subsequent curative instructions clarified this for the jury such that, read as a whole, the jury charge was "correct in law, adapted to the issues, and sufficient for the guidance of the jury . . . ." (Internal quotation marks omitted.) *State* v. *Michael T.*, supra, 97 Conn. App. 484.

In a case strikingly similar to the present case, involving conspiracy to commit murder, *State* v. *Aponte*, 63 Conn. App. 82, 774 A.2d 1035 (2001), aff'd, 259 Conn. 512, 790 A.2d 457 (2002), the same issue was presented, and a similar curative instruction was found to be sufficient to guide the jury. In *Aponte*, the original jury charge instructed the jury that the intent required to be found guilty of conspiracy to commit murder was the "intent to violate the law when [the defendant] entered into the agreement to engage in conduct constituting a crime." (Internal quotation marks omitted.) Id., 87. The defendant took exception to the charge on the intent element, and the court provided a curative instruction that clarified that the object of the conspiracy was the crime of murder. The court stated: "I just want to add one thing . . . and that is when we talk about the conspiracy, the crime that's related to conspiracy is murder so, in other words, the question is whether there was a conspiracy to commit murder as I've defined that for you." (Internal quotation marks omitted.) Id.

In the present case, the court provided a similar curative instruction. In the recharge, the court instructed the jury that the object of the conspiracy was intentional murder. In the second recharge, the court restated that the object of the conspiracy was intentional murder and, further, directed the jury to the section and page of the jury charge that defined intentional murder and named the victim as the object of the murder. In sum, therefore, read as whole, including the curative instruction given by the court, the jury was instructed properly such that it was not misled, and no injustice was done to the defendant.[12]

The judgments are affirmed.

In this opinion the other judges concurred.

---

[12] The defendant relies on *State* v. *DeJesus*, 92 Conn. App. 92, 883 A.2d 813 (2005), appeal dismissed, 282 Conn. 783, 928 A.2d 533 (2007), for the proposition that the court's curative instruction was not sufficient. The issue in *DeJesus* was unique to that case. In *DeJesus*, the defendant was charged with various crimes, the victims of which were different depending on the crime charged. Therefore, it was necessary for the trial court to be specific when it charged on conspiracy to commit murder in that it needed to go "beyond a bare statement of accurate legal principles" and state the person to which the conspiracy count referred. (Internal quotation marks omitted.) Id., 107. In the present case, although it was not necessary for the court to refer to the intended victim by name, as there was only one possible person to whom the charge could relate, the court did name him in its instruction on intentional murder. Therefore, *DeJesus* is distinguishable from the present case.