# STATE OF CONNECTICUT *v.* JOSE AYUSO
## (AC 26360)

Flynn, C. J., and Harper and Peters, Js.

Argued September 18, 2007—officially released January 15, 2008

*Stephanie L. Evans*, special public defender, for the appellant (defendant).

*Harry D. Weller*, senior assistant state's attorney, with whom, on the brief, was *James E. Thomas*, former state's attorney, for the appellee (state).

FLYNN, C. J. The defendant, Jose Ayuso, appeals from the judgment of conviction, rendered after a jury trial, of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), and one count each of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (5), carrying a pistol without a permit in violation of General Statutes § 29-35 and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that (1) his constitutional rights were violated (a) by a witness' assertion of an invalid fifth amendment privilege against self-incrimination or, alternatively, (b) by the failure of the trial court to compel the state to grant that witness immunity, (2) the prosecutor engaged in impropriety that deprived him of a fair trial and (3) the evidence was insufficient to support his conviction for one of the counts of assault in the first degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 5, 2003, at approximately 1 a.m., Officers Tishay Johnson and Victor Otero and Sergeant Gerry Pleasant of the Hartford police department were working undercover to target street crimes in Hartford and were patrolling the city in an unmarked, two door Toyota Tercel. At that time, the undercover officers received a radio dispatch, directing them to investigate the 500 block of Zion Street for loitering and narcotics sales. Johnson then drove northbound on Zion Street, turning right onto Park Street. Johnson entered a driveway located between 835 and 853 Park Street and parked the vehicle in the rear parking lot. After Johnson parked the vehicle, the defendant, who had been standing underneath a nearby tree, approached the driver's side of the vehicle. Pleasant immediately recognized the defendant from previous encounters. Johnson rolled

down the window, and the defendant asked Johnson what he needed. In response, Johnson asked the defendant what he had.

The defendant then looked inside the vehicle at Otero, who was sitting in the backseat, and at Pleasant, who was sitting in the front passenger seat, and then stepped away from the vehicle. Pleasant and Johnson, who still were seated in the front seat, heard the defendant load his gun, which was a .40 caliber Glock semiautomatic handgun. Johnson also observed the defendant point the gun at him. As Johnson was exiting the vehicle, the defendant fired two gunshots in Johnson's direction, one of which struck the bulletproof vest that Johnson was wearing underneath his clothes. The defendant continued to shoot as he moved away from the vehicle, and the officers also fired their .45 caliber semiautomatic handguns. During this time, the defendant shot Otero several times. Johnson briefly chased the defendant down Park Street; however, Johnson returned to the parking lot after exhausting his supply of ammunition. Pleasant then notified the police dispatcher of the situation, providing a description of the defendant, and requested an ambulance. Johnson, who was experiencing pain in his ribs, and Otero, who was bleeding from his abdomen, lay on the ground and waited to be taken to a hospital.

Although the defendant had sought refuge in a nearby apartment building on Mortson Street, responding officers, having been informed of the defendant's whereabouts by a resident of the apartment building, eventually located and arrested him. The police also located the defendant's .40 caliber Glock handgun in an apartment on Mortson Street. The defendant later was brought to the hospital so that the officers could identify him. Johnson made a positive identification of the defendant.

Thereafter, the state charged the defendant with three counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a, two counts of assault in the first degree in violation of § 53a-59 (a) (5), three counts of assault of a peace officer in violation of General Statutes § 53a-167c (a) (1) and one count each of attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (5), carrying a pistol without a permit in violation of § 29-35 and criminal possession of a firearm in violation of § 53a-217 (a) (1).

On December 15, 2004, the jury found the defendant guilty of two counts of assault in the first degree and one count each of attempt to commit assault in the first degree, carrying a pistol without a permit and criminal possession of a firearm. The jury found the defendant not guilty of the other charges. Subsequently, the court imposed a total effective sentence of forty-one years incarceration, with a two year mandatory minimum sentence to serve. Additional facts will be set forth where necessary.

I

FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION CLAIMS

The defendant raises multiple claims regarding the assertion by a witness, Angel Rosa, of his fifth amendment privilege against self-incrimination. On appeal, the defendant claims that he was deprived of his constitutional right to compulsory process to produce witnesses on his behalf under the sixth amendment to the United States constitution and that he was forced to waive his constitutional right to remain silent under the fifth amendment.[1] The defendant argues that his constitutional rights were violated by Rosa's assertion of an

[1] The defendant also references in passing his rights to testify, to be free from compelled testimony, to a fair trial and to due process under article first, § 8, of the constitution of Connecticut. We decline, however, to address

invalid fifth amendment privilege against self-incrimination and, in the alternative, by the court's refusal to compel the prosecution to grant the witness immunity.[2] We are not persuaded by any of the defendant's contentions.

The following additional facts are relevant to our resolution of the defendant's claims. During trial, the

---

this claim because it does not satisfy the standard enunciated by our Supreme Court in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).

[2] In his brief, the defendant also claims, cursorily, that when the court permitted Rosa to invoke the fifth amendment privilege, he was forced to testify on his own behalf in order to provide evidence to support his theory of defense and was precluded from exercising his constitutional right to remain silent. This section of the brief quotes various constitutional principles without relating them to the evidence. To the extent that the claim is set forth, it lacks merit, however, because it is well established that a defendant has the *choice* about whether to testify. See *State* v. *Harrell*, 199 Conn. 255, 266–67, 506 A.2d 1041 (1986); *State* v. *Denson*, 67 Conn. App. 803, 818–19, 789 A.2d 1075, cert. denied, 260 Conn. 915, 797 A.2d 514 (2002). The constitution is not offended by requiring the defendant to make this choice. See *State* v. *Perkins*, 271 Conn. 218, 233, 856 A.2d 917 (2004) ("The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." [Internal quotation marks omitted.]).

Further, we also note that the court, after permitting Rosa to invoke his fifth amendment privilege, asked defense counsel if anyone else had witnessed the confrontation between the defendant and Rosa. Defense counsel indicated that there was another person present, but he did not know the person's identity. On the following day, the court canvassed the defendant about his decision to testify and informed him that he had the right not to testify. The defendant then stated that he would testify. Thereafter, the defendant testified, and the state called its rebuttal witnesses and rested its case. Later that same day, defense counsel informed the court that he had located Michael Callendar, the other man who had witnessed the exchange of words between the defendant and Rosa. Defense counsel questioned Callendar outside of the jury's presence, and Callendar testified that he had observed the confrontation between the two men and that the dispute concerned drug selling territory on Zion Street. Defense counsel, however, declined to call Callendar as a witness at trial. Accordingly, it cannot be said that the court's adverse ruling "compelled" the defendant to the make the choice to testify on his own behalf.

defendant sought to call Rosa, a convicted drug dealer, as a defense witness to support his theory of self-defense. At that time, Rosa was serving a nine year sentence and a one year concurrent sentence for two counts of possession of narcotics with intent to sell and one count of interfering with a police officer; all of the charges related to the sale of narcotics on Zion Street in Hartford and at Rosa's place of business on Zion Street. The defendant wanted Rosa to testify about the multiple disputes he had with the defendant on June 4, 2003, on Zion Street. According to the defendant, Rosa had accused him of being a snitch, had threatened him and had told him that he should carry his gun.

Outside the presence of the jury, the court confirmed that Rosa had consulted with his attorney and then asked Rosa whether he wanted to testify. In response, Rosa stated that he wanted to invoke his fifth amendment right. After the court reminded Rosa that he could confer with his attorney, defense counsel indicated that he wanted to voir dire Rosa. The court granted the request, and Rosa took the witness stand.

Defense counsel began his voir dire of Rosa, outside of the jury's presence, by asking him whether he owned a store on Zion Street, to which Rosa replied that he did own a store. Then, defense counsel asked Rosa to provide the name of the store, and Rosa stated that he did not own the store and that it was his parents' store. After defense counsel asked Rosa whether his parents owned the store, Rosa invoked his fifth amendment privilege against self-incrimination. Defense counsel then questioned Rosa about whether answering the question would incriminate him in any way, to which Rosa refused to answer and again asserted his fifth amendment privilege. Rosa also declined to answer defense counsel's questions about the defendant and the events of June 4, 2003, and, instead, invoked his fifth amendment privilege. Thereafter, defense counsel

requested that Rosa be immunized. Defense counsel also objected to Rosa's invocation of his fifth amendment privilege, arguing that there was no possibility of prosecution. After hearing argument from both parties, the court ruled against the defendant with respect to his request for an order of immunity and his objection to Rosa's assertion of his fifth amendment privilege.

## A

First, the defendant contends that Rosa invoked an invalid fifth amendment privilege against self-incrimination that deprived the defendant of his constitutional right to compulsory process to produce witnesses under the sixth amendment to the federal constitution. The defendant argues that the court improperly upheld Rosa's invocation of the right against self-incrimination because there was no possibility that Rosa could have been subjected to prosecution.[3] We disagree.

Our Supreme Court has stated that a valid fifth amendment privilege against self-incrimination prevails over a defendant's right to compel a witness' testimony on his behalf. *State* v. *Simms*, 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976). Accordingly, we must first ascertain whether Rosa had a valid fifth amendment right to assert. If Rosa's invocation of his fifth amendment privilege was valid, the defendant's sixth amendment right to compulsory process must give way, and he will have failed to state a constitutional claim on appeal. See *State* v. *Mourning*, 104 Conn. App. 262, 276, 934 A.2d 263 (2007); see also *State* v. *Simms*, supra, 209–10.

"A ruling on the validity of a witness' fifth amendment privilege is an evidentiary determination that this court

---

[3] We note that Rosa asserted his fifth amendment privilege in response to a specific question. The defendant did not object at trial on the ground that Rosa's assertion was a "blanket" refusal to testify, nor was that claim raised on appeal.

will review under an abuse of discretion standard. . . . It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Mourning*, supra, 104 Conn. App. 276.

"The standard for determining whether to permit invocation of the privilege against self-incrimination is well established. To reject invocation it must 'be *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate' the witness. . . . The right to the privilege 'does not depend on the likelihood of prosecution but upon the possibility of prosecution.' " (Citations omitted; emphasis in original.) *State* v. *Giraud*, 258 Conn. 631, 640, 783 A.2d 1019 (2001). Our Supreme Court also has stated that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) *State* v. *Simms*, supra, 170 Conn. 209. In other words, one does not have to disclose how he might incriminate himself in order to assert the fifth amendment privilege.

Defense counsel objected to Rosa's assertion of his fifth amendment right. The court clarified that defense counsel intended to question Rosa about the confrontations he had with the defendant on Zion Street. Defense counsel informed the court that he sought to have Rosa testify about his belief that the defendant was a police informant, who had "snitched" on him, and that he had threatened the defendant. According to defense

counsel, the evidence he sought from Rosa did not pertain to his drug dealing, but rather to his confrontations with the defendant in which he had made threats, and, therefore, Rosa's answers could not have subjected him to prosecution because, at the time of trial, the statute of limitations already had run for the crime of threatening.[4] The court, in exploring the basis for Rosa's refusal to testify, reiterated that Rosa was a convicted drug dealer in the Zion Street neighborhood and stated that "the questions on cross-examination could certainly get into his business competition, potentially with the defendant, and a whole bunch of other things." The prosecutor then argued outside of Rosa's presence that there was a possibility that Rosa's testimony regarding his disputes with the defendant on Zion Street could reveal other criminal conduct, exposing him to prosecution.

In the present case, it was not perfectly clear from all the circumstances that the answers could not possibly have a tendency to incriminate the witness. It is well established that "[t]he fifth amendment extends to disclosures that merely 'furnish a link in the chain of evidence needed to *prosecute* the claimant for a . . . crime.' . . . *Hoffman* v. *United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951) . . . ." (Citation omitted; emphasis in original.) *State* v. *Brown*, 22 Conn. App. 521, 526, 577 A.2d 1120, cert. denied, 216 Conn. 825, 582 A.2d 204 (1990). After a colloquy with the

---

[4] General Statutes § 53a-62 (a) provides: "A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) such person threatens to commit any crime of violence with the intent to terrorize another person, or (3) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror."

Because the offense of threatening is a class A misdemeanor, General Statutes § 54-193 (b) provides that no person may be prosecuted except "within one year next after the offense has been committed."

attorneys, the court ruled that Rosa was permitted to invoke his fifth amendment privilege. Answers to defense counsel's questions pertaining to events that occurred on Zion Street involving the defendant and Rosa could have provided a "link in the chain of evidence" and put Rosa at risk for additional prosecutions for crimes.

Moreover, "a witness may properly refuse to respond to a question posed on direct examination where an answer could expose him to the risk of self-incrimination on cross-examination." Id. In the present case, if Rosa had testified, the prosecutor would have been allowed to cross-examine him on matters related to credibility. See id. For example, questions properly could have included inquiries into Rosa's drug dealing on Zion Street, as the court had acknowledged in ruling that the invocation of the privilege was valid, and also into Rosa's reasons for engaging in disputes with the defendant. In fact, the prosecutor indicated that he would cross-examine Rosa on "an abundance of subjects . . . that might very well relate to criminal conduct for which he could be held responsible . . . ." Accordingly, we conclude that the defendant's constitutional rights were not violated and that the court did not abuse its discretion in permitting Rosa to invoke his fifth amendment privilege against self-incrimination.

## B

The defendant also claims, in the alternative, that the court improperly denied his request to have the court order the state to grant immunity to Rosa.[5] The defen-

---

[5] In his appellate brief, the defendant states that he "was denied his right to due process when the trial court refused to instruct the jury as to the unavailability of Angel Rosa." The defendant does not offer any citation or discussion of any authority to support his claim. We therefore decline to review this claim because it has been inadequately briefed. See State v. Carocoglia, 95 Conn. App. 95, 129, 895 A.2d 810, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006). We cannot speculate about what his claim might be when it is not set out with citations to authority.

dant acknowledges that pursuant to General Statutes § 54-47a,[6] the prosecutor, and not the court, has the authority to compel the testimony of a witness through a grant of immunity. Nevertheless, the defendant asserts that his right to compulsory process was violated by the

[6] General Statutes § 54-47a provides: "(a) Whenever in the judgment of the Chief State's Attorney, a state's attorney or the deputy chief state's attorney, the testimony of any witness or the production of books, papers or other evidence of any witness (1) in any criminal proceeding involving narcotics, arson, bribery, gambling, election law violations, felonious crimes of violence, any violation which is an offense under the provisions of title 22a, corruption in the executive, legislative or judicial branch of state government or in the government of any political subdivision of the state, fraud by a vendor of goods or services in the medical assistance program under Title XIX of the Social Security Act amendments of 1965, as amended, any violation of chapter 949c, or any other class A, B or C felony or unclassified felony punishable by a term of imprisonment in excess of five years for which the Chief State's Attorney or state's attorney demonstrates that he has no other means of obtaining sufficient information as to whether a crime has been committed or the identity of the person or persons who may have committed a crime, before a court or grand jury of this state or (2) in any investigation conducted by an investigatory grand jury as provided in sections 54-47b to 54-47g, inclusive, is necessary to the public interest, the Chief State's Attorney, the state's attorney, or the deputy chief state's attorney, may, with notice to the witness, after the witness has claimed his privilege against self-incrimination, make application to the court for an order directing the witness to testify or produce evidence subject to the provisions of this section.

"(b) Upon the issuance of the order such witness shall not be excused from testifying or from producing books, papers or other evidence in such case or proceeding on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. No such witness may be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify or produce evidence, and no testimony or evidence so compelled, and no evidence discovered as a result of or otherwise derived from testimony or evidence so compelled, may be used as evidence against him in any proceeding, except that no witness shall be immune from prosecution for perjury or contempt committed while giving such testimony or producing such evidence. Whenever evidence is objected to as inadmissible because it was discovered as a result of or otherwise derived from compelled testimony or evidence, the burden shall be upon the person offering the challenged evidence to establish a source independent of the compelled testimony or evidence."

Similar provisions authorize the grant of immunity by United States attorneys to compel testimony before federal courts and grand juries. See 18 U.S.C. §§ 6002-6003 (2000).

court's failure to compel the prosecution to immunize Rosa[7] and urges this court to apply the prosecutorial misconduct theory to his claim. We disagree and conclude that the court properly declined the defendant's request.

As a threshold matter, we must first determine the applicable standard of review that governs our examination of the defendant's claim. "The issue of whether a defendant's rights to due process and compulsory process require that a defense witness be granted immunity is a question of law and, thus, is subject to de novo review. . . .

"[A] defendant has a right under the compulsory process and due process clauses to present [his] version of the facts as well as the prosecution's to the jury so [that] it may decide where the truth lies. . . . The compulsory process clause of the sixth amendment generally affords an accused the right to call witnesses whose testimony is material and favorable to his defense . . . .

"[Section] 54-47a authorizes the prosecution to grant immunity to state witnesses under certain circumstances. [Our Supreme Court] explicitly [has] held that § 54-47a confers no such authority upon the courts with regard to defense witnesses. . . . Indeed, [our Supreme Court] has held repeatedly that there is no authority, statutory or otherwise, enabling a trial court to grant immunity to defense witnesses. . . . We have no occasion to revisit those holdings today.

---

[7] In its brief, the state asserts that the defendant waived his claim pertaining to the grant of the immunity for Rosa. Specifically, the state argues that the defendant could have introduced the evidence he sought from Rosa's testimony through the testimony of Callendar and that the defendant's failure to call Callendar as a witness amounted to a tactical decision, which constituted a waiver of the immunity claim. See footnote 2. Because we conclude that the present case does not warrant the application of the prosecutorial misconduct theory of immunity, we need not decide whether the defendant's failure to call Callender effectively waived the immunity claim.

"We recognize that other courts have held that under certain compelling circumstances the rights to due process and compulsory process under the federal constitution require the granting of immunity to a defense witness. The federal Circuit Courts of Appeals have developed two theories pursuant to which the due process and compulsory process clauses entitle defense witnesses to a grant of immunity. They are the effective defense theory, and the prosecutorial misconduct theory. . . .

"The prosecutorial misconduct theory of immunity is based on the notion that the due process clause [constrains] the prosecutor to a certain extent in [the] decision to grant or not to grant immunity. . . . Under this theory, however, the constraint imposed by the due process clause is operative only when the prosecution engages in certain types of misconduct, which include forcing the witness to invoke the fifth amendment or engaging in discriminatory grants of immunity to gain a tactical advantage, and the testimony must be material, exculpatory and not cumulative, and the defendant must have no other source to get the evidence." (Citation omitted; internal quotation marks omitted.) *State v. Kirby*, 280 Conn. 361, 403–404, 908 A.2d 506 (2006); *State v. Holmes*, 257 Conn. 248, 252–55, 777 A.2d 627 (2001), cert. denied, 535 U.S. 939, 122 S. Ct. 1321, 152 L. Ed. 2d 229 (2002).

The defendant, citing *United States v. Burns*, 684 F.2d 1066 (2d Cir. 1982), cert. denied, 459 U.S. 1174, 103 S. Ct. 823, 74 L. Ed. 2d 1019 (1983), argues that the prosecutorial misconduct theory of immunity is applicable to the present case because "[t]he prosecutor, through his own overreaching, forced Angel Rosa to invoke the Fifth Amendment," and, therefore, Rosa should have been immunized. According to the defendant, the prosecutor suggested that Rosa might incriminate himself, which was an "intentional act of

intimidation and manipulation designed to distort and impair the fact-finding process by withholding exculpatory evidence from the jury in order to gain a tactical advantage." Our review of the record reveals, however, that the prosecutor did not force Rosa to invoke his fifth amendment privilege. Contrary to the defendant's contention, the prosecutor did not suggest to Rosa that he could incriminate himself by testifying, nor did he instruct Rosa to invoke his fifth amendment right.

Outside of the jury's presence, the court informed Rosa that the attorneys wanted to ask him some questions and that if he chose to testify, he also would testify before the jury on the following day. Rosa, on his own initiative, then stated that he wanted to assert his fifth amendment right. Thereafter, Rosa took the witness stand, and defense counsel began voir dire. Rosa answered two of defense counsel's questions before invoking his fifth amendment privilege. After Rosa invoked his right, defense counsel specifically asked Rosa whether answering the questions would incriminate him. At that time, the prosecutor still remained silent. Rosa then was excused from the witness stand. Despite the defendant's assertion to the contrary, the prosecutor had done nothing to encourage Rosa's assertion of his fifth amendment right. The prosecutor and defense counsel then began their arguments on defense counsel's objection to Rosa's invocation of his fifth amendment right and defense counsel's request for the immunization of Rosa. We therefore fail to see how the prosecutor engaged in overreaching. Because we do not agree with the defendant that the prosecutor engaged in misconduct, we need not decide whether the prosecutorial misconduct theory is a "correct application of the due process or compulsory process clause." *State* v. *Holmes*, supra, 257 Conn. 255.

## II

## PROSECUTORIAL IMPROPRIETY CLAIMS

The defendant next claims that he was deprived of a fair trial as a result of prosecutorial impropriety. First, the defendant claims that the prosecutor engaged in impropriety during cross-examination of the defendant. The defendant also challenges several remarks made by the prosecutor during rebuttal argument to the jury. We disagree.

As a preliminary matter, we set forth the legal principles that govern our resolution of claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), whether the entire trial was so infected with unfairness as to deprive the defendant of his due process right to a fair trial. See *State* v. *Schiavo*, 93 Conn. App. 290, 302, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006). These factors include the extent to which the misconduct was invited by defense conduct, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case. *State* v. *Williams*, supra, 540.

At trial, the defendant failed to object to all of the alleged instances of prosecutorial impropriety that he takes issue with on appeal. "Once prosecutorial impropriety has been alleged, however, it is unnecessary for

a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, [supra, 204 Conn. 540]." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 33. Having set forth the applicable legal principles, we now examine each of the challenged remarks in turn.

## A

The defendant contends that the prosecutor, in cross-examination of the defendant, improperly highlighted the unavailability of Rosa by repeatedly asking questions about the threats that Rosa allegedly made to the defendant.[8] The following additional facts are necessary

[8] Specifically, the defendant challenges the following questions asked by the prosecutor during the defendant's cross-examination:

"Q. And this threat that was made against you, this took place when?

"A. Say that again.

"Q. The threat that was made against you by Mr. Rosa, when did that take place?

"A. In the morning.

"Q. And you hung around for a while to watch what he was doing?

"A. Yes.

\* \* \*

"Q. So, the threat was in the morning; you didn't arm yourself until it got dark?

"A. Yes.

\* \* \*

"Q. So, you went out at midnight directly across the street from the business of the person who had threatened you that day?

"A. Well, down the street some.

"Q. But it's right across the street, isn't it?

"A. It's on the same street.

\* \* \*

"Q. So, you went down the street to a building next to or two buildings away from the business of the person who threatened you?

to resolve this claim. During direct examination, the defendant testified that on June 4, 2003, he had multiple encounters with Rosa in the Zion Street neighborhood. The defendant further testified that Rosa had accused him of being a snitch and that a dispute ensued. According to the defendant, Rosa also had threatened him and had told him that he had better carry his gun. In addition, the defendant stated that, after the confrontation with Rosa, he observed several of Rosa's friends enter a store that he believed Rosa owned, and, as a

---

"A. Yes.

"Q. And when Mr. Rosa indicated to you, you better have your burner on you tonight, what did you take that to mean?

"A. You better have your gun on you.
* * *

"Q. All right, so, you hang around there all day or at least in an apartment near there, and then at midnight, when it's dark, you armed yourself, you wore dark clothing and you went to visit a friend to smoke weed?

"A. True.
* * *

"Q. So, you're standing on the street smoking weed in an area where your life has just been threatened?

"A. Correct.
* * *

"Q. So, you thought you'd be a target that day; you didn't get into your car and drive off and leave the area?

"A. No, sir.
* * *

"Q. It was dark. And so you're going to take the garbage into this dark parking lot in an area where your life has been threatened?

"A. Yes.
* * *

"Q. So, did you think it was a robbery or were these the people that Mr. Rosa sent to do you harm?

"A. That was—that's what I said. You know, just trying to see what was going on.

"Q. Well, my question, though, was, sir, what did you think? Was it a robbery or was it somebody sent to do you harm?

"A. Both. That's why I said what I said, to see what kind of reaction I would get.
* * *

"Q. Did you, on the morning of June 5, 2003, after you were taken into custody, tell any of the detectives about the threats that Mr. Rosa had made against you?

"A. No, sir."

result, he believed that Rosa was planning on retaliating against him. The defendant's testimony on direct examination also indicated that he had believed that the situation involving the undercover officers was connected to the disputes with Rosa. On cross-examination, the prosecutor questioned the defendant about being threatened by Rosa and about his actions following the confrontations with Rosa.

Our Supreme Court often has stated that "[p]rosecutorial [impropriety] may occur in the course of cross-examination of witnesses . . . ." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 538–39. We conclude, however, that the prosecutor's questions during the defendant's cross-examination were not improper. The subject of the threats allegedly made by Rosa was broached first by defense counsel during direct examination, and, therefore, the prosecutor properly could inquire further into that subject matter. See *State* v. *Vazquez*, 79 Conn. App. 219, 226–28, 830 A.2d 261, cert. denied, 266 Conn. 918, 833 A.2d 468 (2003).

## B

The defendant also claims that the prosecutor engaged in several instances of impropriety during rebuttal argument.[9] Specifically, the defendant argues that the prosecutor improperly tried to bolster the credibility of Johnson by appealing to the jury's emotions and by discussing unchecked and unsworn testimony. In addition, the defendant argues that the prosecutor

[9] In reciting the relevant facts of his prosecutorial impropriety claim, the defendant mentions the prosecutor's remark, which he also objected to at trial, that "[i]f that's all that's required under the law to use deadly force, then there are a lot more neighborhoods that are going to be dangerous." The defendant, however, has not included in his brief an analysis of this alleged instance of prosecutorial impropriety, and, therefore, we do address this statement. See *State* v. *Crocker*, 83 Conn. App. 615, 660–61, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004).

improperly mischaracterized the evidence and referred to an unavailable witness. We disagree.

Because the defendant's remaining claims of prosecutorial impropriety concern remarks that the prosecutor made in rebuttal arguments, we briefly note that "[p]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing [and rebuttal] arguments." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 744–45, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

1

The defendant claims that the prosecutor improperly tried to sway the emotions of the jury by characterizing Johnson's description of the laser sight of the defendant's handgun pointed at his head as "chilling"[10] and by stating that the defendant tried to kill the officers and almost killed Johnson. We are not persuaded.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 376, 897 A.2d 569 (2006).

The prosecutor's statement, in which he characterized Johnson's testimony about having a gun pointed directly at his head as "chilling," was not improper argument. The comment, which was made in response

---

[10] In his rebuttal argument, the prosecutor stated that during Johnson's testimony describing the defendant's laser sight on the gun, "there is a point at which it's very chilling—at least, I thought it was chilling in his description—and he describes the laser coming up the car onto his body, onto his face . . . ." The defendant objected to this statement after the prosecutor had completed rebuttal argument.

to defense counsel's closing argument, was based on the evidence adduced at trial, in which Johnson described the laser sight of the gun being aimed at him.

After reviewing the record, we also cannot conclude that the prosecutor's statements that the defendant "tried to kill these people" and that Johnson was "almost . . . killed" were unsupported by the evidence presented at trial. Johnson provided testimony about how the defendant had fired his gun at the police vehicle and had pointed the gun at Johnson's head. The jury also heard from Otero, who testified that he had sustained serious injuries as a result of the bullets fired from the defendant's gun. Furthermore, the defendant testified that he had shot at the parked vehicle, emptying his gun. In light of the testimony from the officers and from the defendant himself, we conclude that the prosecutor's rebuttal remarks constituted fair comment on inferences which could have been drawn from the evidence to support, for example, the intent element of some of the crimes with which the defendant was charged. See *State* v. *Medina*, 228 Conn. 281, 303, 636 A.2d 351 (1994) ("[i]ntent may be inferred from the nature of any weapons used, the manner in which they were used and the nature and number of wounds inflicted" [internal quotation marks omitted]).

2

Next, the defendant argues that several remarks made during the prosecutor's rebuttal argument amounted to unsworn testimony. The defendant argues that it was improper for the prosecutor to state that the defendant never called the police "because [he] knew the police were already there." In addition, the defendant challenges several instances in which the prosecutor referred to Johnson's state of mind at the time of the shooting. We are not persuaded.

"In reviewing the defendant's claim that the state improperly presented unsworn testimony to the jury during its [rebuttal] argument, we recognize that a prosecutor properly may ask the jury to draw reasonable inferences on the basis of the evidence at trial." *State v. Skidd*, 104 Conn. App. 46, 68, 932 A.2d 416 (2007). "We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State v. Richardson*, 86 Conn. App. 32, 41, 860 A.2d 272 (2004), cert. denied, 273 Conn. 907, 868 A.2d 748, cert. denied, 545 U.S. 1107, 125 S. Ct. 2550, 162 L. Ed. 2d 281 (2005).

The prosecutor's statement during rebuttal argument that the defendant knew that the undercover officers were police did not suggest to the jury that the prosecutor possessed secret knowledge. The prosecutor, in challenging the defendant's version of the events, merely was asking the jury to draw a reasonable inference from the evidence. Pleasant had testified that he knew the defendant from previous encounters. Testimony also indicated that after the defendant had looked inside the parked vehicle, he immediately stepped away and pulled out his gun. The prosecutor, therefore, was arguing an inference that the jury reasonably could draw from the evidence. "Remarks that are nothing more than a permissible appeal to the jurors' common sense do not constitute prosecutorial [impropriety]." *State v. Lindo*, 75 Conn. App. 408, 416, 816 A.2d 641, cert. denied, 263 Conn. 917, 821 A.2d 771 (2003). Further, we note that "[t]here is also no rule that precludes a prosecutor from challenging the defendant's account." *State v. Farr*, 98 Conn. App. 93, 108, 908 A.2d 556 (2006). We conclude that the prosecutor's remark was not improper.

With respect to the challenged remarks about Johnson's state of mind at the time of the shooting, we conclude that the prosecutor's comments did not constitute improper unsworn testimony.[11] In addition to hearing the defendant testify about how he had fired his gun at the undercover police vehicle, the jury heard from Johnson regarding his observations of the defendant loading the gun and pointing it at his head at close range. Johnson also testified that he momentarily "froze," before his "body . . . [and mind] identified" the situation as a threat. Johnson further testified that after being shot, he "was hurting, but the threat was still there so [I decided] to fight through the pain."

The prosecutor's comments about how Johnson, who just had been shot, was nervous and was not thinking clearly, underscored an inference that the jury could have drawn on its own, on the basis of the evidence presented. The challenged remarks did not suggest that the prosecutor had secret knowledge. Moreover, "[j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that

---

[11] "Well, I would argue to you that a reasonable inference could be drawn that I would say Officer Johnson was a little bit upset by what had transpired. He said on the [witness] stand that he believes he fired his weapon at his attacker when he got out of the car. There is no evidence of that. In fact, there is no evidence, if you look at the chart, that he fired his weapon at all until he got down the alley and onto Park Street. Now, that tells you something about Officer Johnson. He's a trained police officer. Someone just tried to kill him. He's in pain. Adrenaline is going. He never fires his weapon, never fires his weapon at the attacker until he gets onto Park Street after the other officers have already emptied their guns. What does that tell you about what's going through his mind? He's not thinking clearly. He's thinking, I just about got killed. He's got that loaded .45 caliber gun in his hand, and he doesn't discharge it. Was he nervous? I would say that almost being killed makes you kind of nervous. It shows that. Any surprise that his testimony here is not necessarily consistent with what actually happened that night or his report, which is written days after, trying to reconstruct this, this incident?"

their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Guadalupe*, 66 Conn. App. 819, 826, 786 A.2d 494 (2001), cert. denied, 259 Conn. 907, 789 A.2d 996 (2002). Accordingly, we conclude that the prosecutor's comments were not improper.

3

The defendant also argues that the prosecutor improperly mischaracterized certain evidence pertaining to the ejection of the cartridge casings from the defendant's handgun. We disagree.

Specifically, the defendant takes issue with the following remarks made by the prosecutor during rebuttal argument: "The problem with counsel's analysis of the evidence is [that] you've heard [Edward Jachimowicz, a firearms and tool mark examiner with the state forensic science laboratory] describe the action of a handgun, semiautomatic pistol, and what happened is, as that slide is vigorously forced by the escaping gases, the shell casing also is *ejected violently* out of the gun. Where does it go? *It doesn't just drop down.* You heard how he described how the shell is ejected. *It's ejected vigorously out of the gun.* Where does it go? What direction? *Those shell casings could have gone anywhere. They could have hit the car behind.*" (Emphasis added.) Defense counsel objected to the prosecutor's comments, arguing that they were speculative, but the court overruled the objection. The prosecutor then proceeded with his rebuttal argument and stated that "[defense counsel] would have you believe that those shell casings just dropped out on the ground and dropped out of the gun and landed on the ground. Well, maybe that's what did happen, but *maybe when they hit the ground they bounced,*" to which defense counsel again objected. (Emphasis added.)

At trial, Jachimowicz testified as follows about the operation of the defendant's handgun: "When you fire this firearm, when you pull the trigger, the gases that are generated by the cartridge would drive the bullet down the barrel, it would also force the slide rearward. As the slide went rearward, the action would open up, *the fired cartridge case* would be hooked by . . . an extractor. *It would be pulled out of the firearm to a point where it hit the ejector, and it would then be thrown out of the firearm.*" (Emphasis added.)

"It is well settled that a prosecutor must not comment on evidence that is not part of the record, nor is he to comment unfairly on the evidence adduced at trial so as to mislead the jury." (Internal quotation marks omitted.) *State* v. *Johnson*, 82 Conn. App. 777, 793, 848 A.2d 526 (2004). On the basis of our review of the record, we conclude that the prosecutor's remarks constituted fair comment, asking the jury to draw reasonable inferences from the evidence presented at trial. We therefore conclude that the defendant's claim that the prosecutor mischaracterized the evidence lacks merit.

4

In his final prosecutorial impropriety claim, the defendant claims that the prosecutor improperly commented on Rosa, who was an unavailable witness. The prosecutor stated during rebuttal argument that "it is not sufficient to use deadly force regardless of what happened or didn't happen with Mr. Rosa."[12]

Our review of the challenged remark in the context of the closing argument made by both parties reveals that the prosecutor's comment was not improper. Contrary to the defendant's assertion, the prosecutor did not comment on the absence of Rosa. Rather, the prosecutor merely was responding to the closing argument

---

[12] The defendant objected to this remark.

made by defense counsel. See *State* v. *Galarza*, 97 Conn. App. 444, 471, 906 A.2d 685 ("[a] prosecutor may respond to the argument of defense counsel during rebuttal"), cert. denied, 280 Conn. 936, 909 A.2d 962 (2006). To support his theory of self-defense, defense counsel reminded the jury during closing argument that the defendant had testified about being threatened by Rosa on the day of the incident. The prosecutor, therefore, attempted to rebut defense counsel's summation by arguing that the defendant's testimony concerning the threats made by Rosa did not support a theory of self-defense.

## III

## SUFFICIENCY OF THE EVIDENCE CLAIM

The defendant's final claim is that the court improperly denied his motion for a judgment of acquittal on the ground that there was insufficient evidence to support his conviction on one of the counts of assault in the first degree. Specifically, the defendant argues that the evidence was insufficient to prove beyond a reasonable doubt that Johnson was injured by a bullet that was discharged from the defendant's firearm. We are not persuaded.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the

basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 808–809, 911 A.2d 1099 (2007).

"To convict the defendant of assault in the first degree under § 53a-59 (a) (5), the state must demonstrate with proof beyond a reasonable doubt that the defendant

(1) intended to cause physical injury to another person, (2) caused such injury to such person or a third person and (3) did so by means of the discharge of a firearm." *State* v. *Williams*, 94 Conn. App. 424, 435, 892 A.2d 990, cert. denied, 279 Conn. 901, 901 A.2d 1224 (2006).

The defendant claims on appeal that there was insufficient evidence demonstrating that the discharge of his firearm caused Johnson's injury.[13] In support of his claim, the defendant first contends that the evidence showed that it "was virtually impossible" for Johnson to have been injured by a bullet from the defendant's firearm because, when looking at the nine bullet entry points on the exterior of the vehicle, only one of the bullets was within striking distance of Johnson.[14] Additionally, the defendant argues that Johnson's testimony

[13] After reviewing the evidence presented to the jury and reviewing the transcript from the hearing on the defendant's motion for examination of evidence, which occurred outside of the jury's presence, we are of the opinion that in his brief to this court, the defendant has argued, in part, inferences drawn from the evidence presented at the hearing on the motion. Specifically, the defendant argues that there was insufficient evidence to sustain his conviction on one of the counts of assault in the first degree, referring to defense counsel's statement during the hearing on the motion in which counsel stated that "the vest that Officer Johnson was wearing did not appear to contain any type of marking or bullet hole."

The jury, however, was not present at the hearing on the motion. Therefore, we cannot consider the evidence that was presented at that hearing in reviewing the sufficiency of evidence that the jury considered in reaching its verdict. See *State* v. *Rivera*, 74 Conn. App. 129, 137 n.7, 810 A.2d 824 (2002).

[14] In connection with his arguments concerning the virtual impossibility of Johnson being struck by a bullet from the defendant's firearm, the defendant posits that the physical evidence supports two reasonable hypotheses that are inconsistent with his guilt of assault in the first degree. The defendant asserts that because Johnson was wearing his gun under his shirt, "[i]t is very possible that [Johnson] injured his own rib while he was trying to pull his gun from his waist." In addition, the defendant argues that because a bullet, consistent with those issued by police, was found behind the driver's seat, "it is very possible that while Otero was in the backseat, firing . . . one of [the bullets] could have grazed Johnson as he was in the process of getting out of the driver's seat."

Although the defendant offers possible hypotheses of innocence, he misapplies the standard by which we review sufficiency claims, and our review of the defendant's claim is not controlled by his possible interpretations of

was not credible and should not have been believed because of inconsistencies between Johnson's testimony at trial and his police report, as well as inconsistencies between his testimony and the testimony of the other witnesses. We do not agree.

The evidence, when viewed in a light most favorable to sustaining the verdict, reveals facts from which the jury reasonably could have inferred that a bullet discharged from the defendant's firearm caused Johnson's injury. At trial, Johnson testified that after the defendant looked into the vehicle at the other occupants, the defendant stepped away from the vehicle, pulled out a firearm and loaded the weapon. Johnson observed the defendant, who was standing a short distance away from the vehicle, point the laser sight of the firearm directly at his head. Johnson further testified that as he was exiting the vehicle, the defendant fired two bullets in his direction, one of which struck him in the abdominal area.

The jury also heard from Pleasant, who indicated that after hearing the defendant load the firearm, he heard a rapid succession of gunshots and observed the drivers' side window shatter as Johnson exited the vehicle. The state also called Detective Timothy Shaw to testify about his investigation of the scene of the incident. Shaw testified that the police found nine spent shell casings, which were ejected from the defendant's firearm, in the parking lot near the undercover police vehicle. During his testimony, the defendant also informed

the evidence. See *State* v. *Salaman*, 97 Conn. App. 670, 677, 905 A.2d 739, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 280 Conn. 809. Accordingly, for the reasons we will discuss, we conclude that there is a reasonable view of the evidence from which the jury inferred that a bullet from the defendant's firearm caused Johnson's injury.

the jury about how he had pulled out his firearm and had shot ten rounds at the vehicle, emptying his gun.

Johnson, who had been wearing a bulletproof vest, stated that he experienced pain and a burning sensation near the right side of his ribs immediately after the incident. As a result of being shot, Johnson testified that he had a bruise on his right abdominal area, a bruised liver and a fractured rib. When Pleasant had rendered assistance to Johnson, he observed a wound "where the bullet had impacted the bulletproof vest and burned [Johnson's] skin from the twisting action of the bullet." Additionally, the state presented Ronald Gross, a trauma surgeon, who testified that he had examined Johnson's abrasions located on his hip and right arm, which he thought were consistent with a bullet wound.

Construing the evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the defendant was guilty beyond a reasonable doubt of assault in the first degree. The jury had before it ample evidence from which it could infer that one of the ten bullets that the defendant had fired at the vehicle struck Johnson and caused his injury. The cumulative effect of the evidence, namely, the location of the defendant's spent shell casings, the entry points of the bullets on the vehicle, the position of Johnson next to the vehicle during the shooting, and the testimony and reasonable inferences drawn therefrom, was sufficient to establish that Johnson was injured by a bullet from the defendant's firearm.

To the extent that the defendant focuses on minor inconsistencies in Johnson's testimony, the defendant primarily is attacking Johnson's credibility. However, it is well settled that "[w]hether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to

weigh conflicting evidence and to determine the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 93 Conn. App. 739, 751, 890 A.2d 591 (2006), appeal dismissed, 281 Conn. 817, 917 A.2d 959 (2007). "[T]he [jury] can . . . decide what—all, none or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Salmon*, 66 Conn. App. 131, 145, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002). Because questions of whether to believe or to disbelieve a competent witness are beyond our review, we reject the defendant's argument. Accordingly, we conclude that the court properly denied the defendant's motion for a judgment of acquittal.

The judgment is affirmed.

In this opinion the other judges concurred.